**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

EXECUTIVE RISK INDEMNITY, INC.,

        Plaintiff,

v.                              CIVIL ACTION NO.  2:08-cv-00810

CHARLESTON AREA MEDICAL CENTER, INC., et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

This multi-party insurance case involves a dispute over which insurance company, if any, must provide coverage to Charleston Area Medical Center, Inc. ("CAMC") for a multi-million dollar verdict against CAMC and a resulting settlement.  As is the case with most hospitals, which incur significant risks in their day-to-day operations, CAMC holds several insurance policies with varying levels of coverage for different risks, and is insured by multiple insurance companies, some of whom are then reinsured by other insurance companies.  Three such companies are involved in this suit: Executive Risk Indemnity, Inc. ("ERI"), Employers Reinsurance Corporation, n/k/a Westport Insurance Corporation ("ERC"), and Vandalia Insurance Company ("Vandalia").  The convoluted relationship among the parties, who have asserted various claims against each other and are also all involved in a related case pending before this court,[1] adds an additional layer of complexity to this

---

[1]  There is a second declaratory judgment action pending before this court in which ERC is the plaintiff and which involves the same parties as in the instant matter: *Employers Reinsurance Corporation v. Charleston Area Medical Center, Inc. et al.*, 2:08-cv-303.  ERC has filed motions
(continued...)

matter, which already poses complex issues of reinsurance law, contract interpretation, and equitable principles.

　　　　To summarize the basic allegations in this case, the plaintiff, ERI, claims that its policy does not provide coverage for punitive damages,[2] and also argues that Vandalia (allegedly a captive insurance company) and ERC (allegedly an assumption reinsurer) are liable to CAMC.  Vandalia, who also alleges that it was just a conduit between CAMC and ERC, argues that ERC has assumed all of its liability to CAMC and therefore owes coverage to CAMC.  CAMC contends that ERI and ERC are obligated to provide coverage to CAMC, but that Vandalia does not.  ERC denies that it owes coverage to CAMC or that it is obligated to provide contribution to ERI or Vandalia.

　　　　This Order addresses the several pending motions by Defendant/Cross-Defendant ERC, namely, its Motion to Dismiss the Second Amended Complaint [Docket 39], Motion to Dismiss the Cross-Claim of Vandalia Insurance Company [Docket 59], and Motion to Dismiss the Cross-Claim of Charleston Area Medical Center, Inc. [Docket 61].

　　　　In the Second Amended Complaint, ERI asserts two claims: (1) a declaratory judgment action and (2) a claim for equitable contribution against ERC and Vandalia.  ERC moves to dismiss ERI's Complaint against it insofar as ERI asserts a claim for equitable contribution against ERC. Although ERC has not explicitly sought to dismiss ERI's declaratory judgment action, insofar as ERC may be seeking its dismissal, the Motion is **DENIED** because there is a substantial live

---

[1](...continued)

in that case in response to Vandalia and CAMC's counter-claims that are similar to the motions addressed in this Order.

[2] It is somewhat unclear to me as to whether ERI is seeking a declaration that its policy does not cover punitive damages or the entire verdict/settlement.

-2-

controversy between the parties, who have adverse interests, and this issue is of sufficient immediacy and reality to warrant the issuance of a declaration of rights or other legal relations. *See* 28 U.S.C. § 2201(a); *Energy Corp. of Am. v. Bituminous Cas. Corp.*, 543 F. Supp. 2d 536, 541 (S.D. W. Va. 2008); *Majeed v. North Carolina*, 520 F. Supp. 2d 720, 724-25 (E.D.N.C. 2007). However, ERC's Motion to Dismiss the Second Amended Complaint is **GRANTED** as to ERI's claim for equitable contribution against ERC because ERI and ERC do not insure the same risk. *See Union Indem. Ins. Co. of N.Y. v. Certain Underwriters at Lloyd's*, 614 F. Supp. 1015, 1016 (S.D. Tex. 1985).

ERC also seeks to dismiss CAMC's cross-claim. CAMC asserts the following claims against ERC: a declaratory judgment cause of action, a breach of contract claim, claims for statutory and common law bad faith, and a claim for unjust enrichment. Insofar as ERC is seeking to dismiss CAMC's declaratory judgment action, the Motion is **DENIED** because, as I have stated, there is a substantial live controversy between the parties and this issue is of sufficient immediacy and reality to warrant the issuance of a declaration of rights. ERC's Motion to Dismiss CAMC's Cross-Claim is also **DENIED** as to CAMC's claims for breach of contract, statutory and common law bad faith, and unjust enrichment because CAMC has alleged sufficient facts to state those claims against ERC under Federal Rule of Civil Procedure 8 and to avoid dismissal under Rule 12(b)(6).

Finally, ERC has moved to dismiss Vandalia's cross-claim. Vandalia has asserted a declaratory judgment action as well as breach of contract and unjust enrichment claims against ERC. ERC's Motion to Dismiss Vandalia's Cross-Claim is **DENIED** as to Vandalia's declaratory judgment action for the same reasons I have discussed as to the other declaratory judgment actions—there is a substantial live controversy between the parties and this issue is of sufficient

immediacy and reality to warrant the issuance of a declaration of rights. The Motion is also **DENIED** as to Vandalia's breach of contract claim because Vandalia has alleged sufficient facts to state such a claim and avoid dismissal under Rule 12(b)(6). However, ERC's Motion to Dismiss Vandalia's Cross-Claim is **GRANTED** as to Vandalia's claim for unjust enrichment against ERC because Vandalia has not alleged that *Vandalia* (rather than CAMC) has paid any money to ERC and that ERC has been unjustly enriched as a result.[3]

## I. Background

The alleged facts giving rise to this matter are as follows. On February 7, 2008, a jury in the Circuit Court of Kanawha County, West Virginia returned a verdict against CAMC for $5,000,000 in compensatory damages and $20,000,000 in punitive damages in the case of *Hamrick v. CAMC et al.* ("Underlying Litigation").[4] The award was reduced by the trial judge to $2,000,000 in compensatory damages and $8,000,000 in punitive damages. The Underlying Litigation subsequently settled for $11,500,000, including interest, attorneys' fees, and all contingencies. The settlement was funded in part by CAMC, which contributed a portion of its self-insured retention, and the balance was to be funded by CAMC's three insurers: ERI, ERC, and Vandalia. CAMC has alleged, however,[5] that Vandalia contributed no monies to fund the settlement, while the other

---

[3] Consequently, the similar motions filed by ERC before the Second Amended Complaint, namely, its Motion to Dismiss First Amended Complaint [Docket 17], Motion to Dismiss the Cross-Claim of Charleston Area Medical Center, Inc. [Docket 25], and Motion to Dismiss the Cross-Claim of Vandalia Insurance Company [Docket 27], are hereby **DENIED as moot**.

[4] The Underlying Litigation arose from CAMC's revocation of Dr. R.E. Hamrick, Jr.'s hospital privileges.

[5] CAMC made this allegation in in its Answer to the First Amended Complaint filed in the related case of *Employers Reinsurance Corporation v. Charleston Area Medical Center, Inc. et al.*, (continued...)

parties contributed as follows: ERI $8,050,000; CAMC $1,995,000; and ERC $1,495,000.[6] Vandalia agrees that it has not contributed any funds to the settlement.

As part of the settlement, the parties agreed to reserve all rights pertaining to the respective insurance policies. Thereafter, this dispute arose over which of CAMC's three insurers, if any, must provide coverage to CAMC for the verdict in the Underlying Litigation and the subsequent settlement. I will now briefly describe the insurance policies at issue.

ERI provided Directors, Officers and Trustees Liability Insurance to CAMC effective from May 1, 2004 to May 1, 2005.[7] (2d Am. Compl. ¶ 12 & Ex. A [Docket 37].) The ERI policy provides $10,000,000 of coverage, and ERI undertook the defense of CAMC in the Underlying Litigation. (CAMC Crossclaim ¶ 10 [Docket 49] .) On March 12, 2008, ERI issued a reservation of rights letter notifying CAMC that its policy did not provide coverage for punitive damages. (*Id.* ¶ 12.)

Vandalia issued the Hercules policy to CAMC, which provided the following coverage to CAMC effective from May 1, 2004 to May 1, 2005: Health Care Professional Liability, Directors and Officers Liability, and General Liability.[8] (*Id.* ¶¶ 14-15; 2d Am. Compl., Ex. B.) Under the Hercules policy, CAMC agreed to pay $2,573,988 in premiums, including captive fees, to Vandalia

---

[5](...continued)
2:08-cv-303 [Docket 59]. CAMC incorporated that filing into this litigation in its Response in Opposition to the Motion by ERC to Dismiss Crossclaim [Docket 66].

[6] I acknowledge that these figures do not add up to $11,500,000, but rather to $11,540,000. But these are the numbers pled by CAMC, and I will not speculate as to where the mistake occurred. I note that I do not have any documentation relating to the settlement, that is, what monies were contributed (and by whom) or the particulars of the reservation of rights among the parties.

[7] The ERI policy at issue is Healthcare Organization Reimbursement Policy No. 8142-0835.

[8] The Hercules policy is Policy No. UMBH033.

and Vandalia agreed to indemnify CAMC under certain circumstances.  (2d Am. Compl., Ex. B.) Groups II and III of the Hercules policy are relevant to this case.  Group II provides Directors and Officer's Liability coverage for all amounts in excess of ERI's coverage up to $25,000,000 per loss event and in the aggregate.  (*Id.* at 22; Vandalia's Cross-Claim ¶ 18 [Docket 48].)  Under Group III of the Hercules policy, which insures General Liability, CAMC has a self-insured retention amount of $2,000,000,[9] and the policy provides coverage to CAMC for all amounts above the $2,000,000 self-insured retention up to $25,000,000 per loss event and in the aggregate.  (*Id.* ¶ 19.)  Vandalia has maintained that it does not have any rights or obligations to CAMC under the Hercules policy because Vandalia was set up by ERC and CAMC to serve as a "straw man" and ERC therefore assumed all of Vandalia's rights and obligations to CAMC under a reinsurance agreement.

ERC issued a Facultative Reinsurance Certificate and Reinsurance Schedule ("Reinsurance Certificate") to Vandalia for 100% of the liability of the Hercules policy effective from May 1, 2004 to May 1, 2005.[10]  (*Id.* ¶ 16.)  Vandalia was not obligated to pay a retention amount.  (2d Am. Compl., Ex. C.)  The annual premium amount due to ERC from Vandalia was $2,573,899.  (*Id.*)  The parties disagree about the terms of the Reinsurance Certificate, and whether ERC assumed all of Vandalia's rights and obligations to CAMC under that agreement.

It is evident that the dispute about which party must provide coverage for the verdict/settlement is complicated by the parties' representations about their relationship to Vandalia.

---

[9]  A self-insured retention is in effect a large deductible that is owed by the insured and which the insurer does not cover.  *See* 2 Insurance Claims and Disputes 5th § 11:31 (Allan D. Windt ed. West 2009).

[10]  The Facultative Reinsurance Certificate number is FCM-0651933-09-2004 and the Reinsurance agreement is policy number UMBH033.

ERI, Vandalia, and CAMC allege that ERC worked with CAMC and West Virginia United Health Systems, Inc. to establish Vandalia as a pass-through company between ERC and CAMC for insurance coverage. They claim that Vandalia was established to allow CAMC to access the reinsurance market and ERC's services without the involvement of an independent primary insurer and to provide a legal conduit for ERC to provide primary coverage under the guise of 100% reinsurance for the Hercules policy. ERI, Vandalia, and CAMC allege that ERC assumed all of Vandalia's rights and obligations under the Hercules policy and became the primary insurer for CAMC (1) by contracting for such assumption in the relevant contracts, the Reinsurance Certificate and the Hercules policy, and (2) through ERC's relationship and dealings with CAMC and Vandalia outside of the contract. Specifically, they contend that CAMC directly paid ERC an annual premium under the Hercules policy, rather than CAMC paying premiums to Vandalia under the Hercules policy and Vandalia paying premiums to ERC under the Reinsurance Certificate. ERI, Vandalia, and CAMC further allege that for twenty-five years, ERC and CAMC dealt directly with each other in all matters, including the handling of claims.[11]

---

[11] Some definitions of these insurance concepts may be helpful. ERI, Vandalia, and CAMC argue that Vandalia is a so-called "captive insurer." "A captive insurer is a corporation organized for the purpose of insuring the liabilities of its shareholders or their affiliates." *Wright v. Comm'r Internal Revenue*, Nos. 1000-90, 18407-90, 27968-90, 18407190, 26402-91, 1993 WL 280468, at *17 (T.C. July 26, 1993); *see also Clougherty Packing Co. v. Comm'r Internal Revenue*, 811 F.2d 1297, 1298 n.1 (9th Cir. 1987). I note that under that definition, however, CAMC is the parent company of the captive Vandalia, not ERC.

The creation of a captive insurance company can bring tax, economic, and commercial benefits, including access to reinsurance markets. *See Coachmen Indus., Inc. v. Willis of Ill., Inc.*, 565 F. Supp. 2d 755, 760 n.8 (S.D. Tex. 2008); Am. Jur. 2d Federal Taxation ¶ 16281. Additionally, captive insurance can serve as a way to insure risks that are otherwise difficult to insure on the traditional insurance market. *Coachmen*, 565 F. Supp. 2d at 760 n.8.

ERI, Vandalia, and CAMC also argue that Vandalia is merely a fronting insurer acting for ERC. "Under a 'fronting' arrangement, a licensed insurer issues a policy with the understanding (continued...)

ERC disputes these contentions.  It argues that the contracts do not reflect the relationship alleged by the other parties and that the language of the contracts governs this matter to the exclusion of all other evidence.  Moreover, ERC alleges that it would not owe payment to Vandalia or CAMC in any case because neither party has made a specific claim for payments under the Hercules policy or Reinsurance Certificate.  ERC also argues that Vandalia has not asserted that it has made any payments that have not been reimbursed, or that payments are owed to CAMC over its self-insured retention amount.

**A. ERI's claims**

In this action, ERI is seeking a declaration that the verdict/settlement is not covered by the ERI policy,[12] but that the Hercules policy provides such coverage to CAMC.  In the alternative, ERI argues that CAMC is not insured in whole or in part for the verdict/settlement by any of the insurance companies involved in this suit.  In the event that the court finds that coverage exists under the ERI policy, ERI seeks equitable contribution from Vandalia and ERC and asks this court to make an equitable allocation of coverage between the three companies.  Furthermore, to the extent that

---

[11](...continued)
that another party will reinsure the fronting insurer for most, if not all, of the claims on that policy." *St. Paul Fire & Marine Ins. Co. v. Eliahu Ins. Co., Ltd.*, No. 96 Civ. 7269 (MBM), 1997 WL 357989, at *2 n.3  (S.D.N.Y. 1997) (citing Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 15.02[c] (8th ed.1995)); *see also Ins. Co. of N. Am. v. Pyramid Ins. Co. of Bermuda Ltd.*, No. 92 Civ. 1816, 1994 WL 88701, at *4 (S.D.N.Y. Mar. 16, 1994) (explaining that as part of a fronting arrangement, an insurer issues a policy for a fee with the intent of passing most or all of the risk back to the policyholder in order to retain risks, access reinsurance, transfer claims handling duties, or satisfy financial responsibility laws).

[12]  In support of this allegation, ERI references the letters in which it notified CAMC of its coverage position. (2d Am. Compl. ¶¶ 22-25, 31.) ERI acknowledges that it reimbursed CAMC for its defense costs related to the Underlying Litigation.  (*Id.* ¶ 24.)

any or all of the verdict/settlement is uninsured or in excess of the applicable coverage limits, ERI asks that the court allocate all or part of the monies owed to CAMC.

To support its claim for equitable contribution, ERI contends that ERC worked with CAMC and West Virginia United Health Systems, Inc., to establish Vandalia as a pass-through between ERC and CAMC to allow CAMC to access the reinsurance market and ERC's services without an independent primary insurer.  (2d Am. Compl. ¶¶ 39-40, 47.)  ERI also alleges that Vandalia is a captive or fronting company that was established to provide a legal conduit for ERC to provide CAMC with primary insurance coverage under the 100% reinsurance of the Hercules policy.  (*Id.* ¶¶ 41-42.)  ERI alleges that the Hercules policy was written by ERC and that CAMC paid ERC premiums under the Hercules policy rather than paying Vandalia.  (*Id.* ¶¶ 43, 45.)  ERI claims that Vandalia was relieved of any risks under the Hercules policy by the Reinsurance Certificate and that its rights and obligations were entirely assumed by ERC who became the primary insurer.  (*Id.* ¶¶ 44, 46, 49.)  ERI goes on to allege that ERC did not observe any of the formalities relating to Vandalia for twenty-five years, but worked directly with CAMC in handling claims.  (*Id.* ¶ 48.)  ERI states that CAMC and Vandalia complied with all of the terms in the Hercules policy and Reinsurance Certificate and that ERC is required to provide coverage in this matter.[13]  (*Id.* ¶¶ 50-54.)

---

[13]  In support of its assertions about the three insurance policies, ERI quotes key provisions of the ERI policy, Hercules policy, and Reinsurance Certificate in some detail and attaches those contracts in their entirety to the Complaint.  (2d Am. Compl. ¶¶ 17-29, 36-38; *Id.* Ex. A, B., C.).

Additionally, in a counterclaim against ERI not implicated by the instant motions, CAMC has asserted that ERI's policy provides coverage to CAMC for punitive damages and that the verdict/settlement did not trigger any limiting or exclusionary language in the ERI policy.  (CAMC Counterclaim ¶ 12.)  CAMC contends that it has fully complied with all of its obligations under the ERI policy, that ERI is obligated to provide coverage for the verdict, and that ERI is in breach of its obligations under the policy.  (*Id.* ¶¶ 15-17.)   CAMC requests that this court enter judgment
(continued...)

**B. Vandalia's claims**

Vandalia has filed a cross-claim against ERC in which it seeks a declaratory judgment that ERC is directly liable to CAMC because, although ERC nominally provided reinsurance coverage to Vandalia, ERC in fact provided primary insurance coverage to CAMC.  (Vandalia Cross-Claim ¶ 28.)  Vandalia also alleges that it was created at the direction of and with the assistance of ERC to serve as a "captive or fronting insurer[] that serve[d] as [a] legal conduit[] that permit[ted] ERC to 'reinsure' 100% of an underlying 'primary' insurance risk."  (*Id.* ¶ 8.)  Vandalia alleges that it is jointly owned by CAMC and West Virginia United Health Systems, Inc., and served as a "pass-through company" between ERC and CAMC to allow CAMC to access the reinsurance services of ERC without the involvement of an independent primary insurer.  (*Id.*  ¶¶ 11-12, 35.)  It further alleges that ERC wrote both policies and that ERC is one of a limited number of reinsurance companies that use policies like the Hercules policy, which was created and written by ERC, to reinsure 100% of the primary risk through a captive arrangement.  (*Id.* ¶¶ 14-15, 36-37.)  Vandalia therefore claims that ERC's reinsurance agreement relieved Vandalia of any risks under the Hercules policy because ERC reinsured 100% of any amount Vandalia was obligated to pay under the Hercules policy.  (*Id.*  ¶¶ 20-22.)  Vandalia alleges that it does not have any independent rights or obligations under the Hercules policy because those rights and obligations were assumed by ERC, including the control over the payment of monies to CAMC and claim-handling.  (*Id.* ¶ 23.)

---

[13](...continued)
against ERI and order it to provide full coverage pursuant to the policy and to reimburse CAMC for costs, expenses and attorneys' fees.

Vandalia states that ERC or its representative Myron Steves, Inc.[14] have always handled claims directly with CAMC in the twenty-five years that the reinsurance agreement has been in place. (*Id.* ¶ 28.) While CAMC sometimes provided notice of claims to Myron Steves, Inc., CAMC would also notify ERC directly and never issued such notices through Vandalia. (*Id.* ¶ 40.)  No notices ever came from Vandalia.  (*Id.*)  In fact, all of the communications and coordination under the Reinsurance Agreement, which that agreement states were to be handled by Vandalia, were routinely accomplished by CAMC. (*Id.* ¶ 43.)  Vandalia states that "[a]s an example of ERC's indifference to the very terms of the ERC Reinsurance agreement, it is undisputed that with regard to the two claims ERC paid on the Hercules policy, ERC paid such claims without any proof whatsoever that Vandalia had paid anything on those claims." (*Id.* ¶ 42.)

Vandalia also alleges that CAMC paid ERC directly for its coverage and that ERC has accrued profits of approximately $38,000,000 over twenty-five years of business dealings. (*Id.* ¶ 22.) Vandalia asserts that ERC will be unjustly enriched if it is permitted to accept those premiums, but avoid its obligations. (*Id.* ¶ 38.)

Alternatively, Vandalia argues that ERC should provide coverage to Vandalia under the Reinsurance Certificate. Vandalia asserts that it and CAMC have complied with all of their obligations under the Hercules policy and the ERC reinsurance agreement, but that ERC has denied coverage to both entities in breach of those contracts. (*Id.* ¶ 33, 51-55.)  Vandalia alleges that "to the extent that CAMC is entitled to coverage under the Hercules policy, ERC is obligated to provide

---

[14]  Vandalia and CAMC also claim that Myron Steves, Inc. was instrumental in establishing Vandalia to act as a pass-through company between CAMC and ERC.

coverage to Vandalia under the ERC Reinsurance agreement." (*Id.* ¶ 54.) These allegations may constitute a breach of contract claim against ERC, which I will discuss in greater detail.

### C. CAMC's claims

CAMC has also filed a cross-claim against ERC in which it asserts a declaratory judgment action as well as claims for breach of contract, unfair settlement practices, bad faith, and unjust enrichment against ERC. CAMC reiterates ERI and Vandalia's arguments about Vandalia's status as a captive or fronting insurance company that merely provides a legal conduit for ERC to provide primary insurance to CAMC. (CAMC Cross-Claim ¶¶ 11-13.) In addition, CAMC alleges that ERC is a reinsurance company that has a long-standing business relationship with insurance broker Myron Steves, Inc., and that issues reinsurance policies to primary insurers, some of which are captive or fronting insurers permitting ERC to reinsure 100% of an underlying insurance risk. (*Id.* ¶¶ 8-10.) CAMC further alleges that the Hercules policy, which was drafted entirely by ERC, is a unique ERC product that the company has sold to others in the insurance market. (*Id.* ¶ 15.) ERC allegedly "is one of a limited number of reinsurance companies that write primary insurance risks using products such as the Hercules policy by reinsuring 100% of the primary risk through a captive arrangement." (*Id.*)

CAMC contends that ERC relieved Vandalia of any risks under the Hercules policy, that CAMC paid ERC directly for reinsurance coverage under the Hercules policy, and that Vandalia retained no independent rights or obligations. (*Id.* ¶¶ 21-22.) CAMC adds that ERC completely controls the payment of all insurance monies above CAMC's self-insured retention amount and that during over twenty-five years of business dealings, all communications ran directly from ERC or Myron Steves, Inc. to CAMC. (*Id.* ¶¶ 25, 27.) CAMC describes in some detail email

correspondence between ERC and CAMC to illustrate this relationship, and contends that ERC paid two claims on the Hercules policy without any proof that Vandalia had paid those claims.[15]  (*Id*. ¶ 42-44, 57, 67, 70-71.)

CAMC argues that "[u]nder the terms of the Hercules Policy and the ERC Reinsurance agreement, which were drafted by ERC for use to implement this captive situation, the rights normally vested in the 'primary insurer' were vested in ERC." (*Id*. ¶ 46.)  CAMC therefore claims that ERC stands in Vandalia's shoes and is in privity of contract with CAMC.  (*Id*. ¶ 37.)  CAMC further alleges that CAMC and Vandalia have complied with all of their obligations under the contracts but that ERC has denied coverage.  (*Id*. ¶ 33.)  Alternatively, CAMC asserts that it is a third-party beneficiary of the Reinsurance Certificate.  (*Id*. ¶ 38.)  CAMC asserts that ERC has waived the formalities of the ERC–Vandalia–CAMC relationship and cannot "hide behind the formalities of Vandalia in order to attempt to deny coverage to CAMC." (*Id*. ¶ 48.)

CAMC additionally has asserted an unjust enrichment claim against ERC, arguing that if ERC is permitted to deny coverage to CAMC, it will have been unjustly enriched because CAMC paid ERC an annual premium amount of approximately $2,568,646.51.[16]  (*Id*. ¶ 22, 39.)  CAMC estimates that ERC has accrued approximately $38,000,000 in profits from the CAMC–Vandalia–ERC relationship from premiums and interest (minus the amount of two claims ERC paid to Vandalia).  (*Id*. ¶ 28, 39.)

---

[15]  CAMC alleges that ERC paid two claims over the course of its relationship with CAMC—a claim in 1991 for which ERC paid $500,000 and a claim in 1993 for which ERC paid $1,900,000.  (CAMC Cross-Claim ¶ 70.)  CAMC claims that it settled within its self-insured retention or otherwise resolved all other actual or potential claims without cost to ERC.  (*Id*.)

[16]  I note that this premium amount does not match the premium amounts contained in the terms of either the Hercules policy or the Reinsurance Certificate.

## II.  Motion to Dismiss standard

There are three pending motions to dismiss: ERC's Motion to Dismiss the Second Amended Complaint, its Motion to Dismiss Vandalia's Cross-Claim, and its Motion to Dismiss CAMC's cross-claim.[17]   A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading.  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008).  Federal Rule of Civil Procedure 8 requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  As the Supreme Court recently reiterated in *Ashcroft v. Iqbal*, that standard "does not require 'detailed factual allegations' but 'it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) for the proposition that "on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'").  A court cannot accept as true legal conclusions in a complaint that merely

---

[17]   The pending motions could also have been brought under Rule 12(c) for judgment on the pleadings because ERC appears to argue that the non-moving parties cannot legally state a claim as opposed to them not having stated a claim.  Regardless, the standards under Federal Rule of Civil Procedure 12(c) for a motion for judgment on the pleadings are identical to those applicable to a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss.  *See Streater v. Cox*, No. 08-1631; 2009 WL 1872471, at *3 (6th Cir. June 30, 2009) (applying *Twombly* to 12(c) motion); *see also Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816 (1994).

I note that because ERI's policy, the Hercules policy, and the Reinsurance Certificate were all referenced in and attached to the Second Amended Complaint, I may consider those agreements in a motion to dismiss without converting the motion into one for summary judgment.  *See Blankenship v. Manchin*, 471 F.3d 523, 526 n.1 (4th Cir. 2006);  *Pueschel v. United States*, 369 F.3d 345, 353 n.3 (4th Cir. 2004).

recite the elements of a cause of action and are supported by conclusory statements. *Iqbal*, 129 S. Ct. at 1949-50. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570). To achieve facial plausibility, the plaintiff must plead facts that allow the court to draw the reasonable inference that the defendant is liable, and those facts must be more than merely consistent with the defendant's liability to raise the claim from merely possible to plausible. *Id.*

In determining whether a plausible claim exists, the court must undertake a context-specific inquiry, "[b]ut where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)). A complaint must contain enough facts to "nudge[] [a] claim cross the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

The *Iqbal* court suggested a two-pronged inquiry to determine if the complaint survives a motion to dismiss, which I will apply here. First, I will identify any pleadings that are not entitled to the assumption of truth because they are conclusory and unsupported by factual allegations. *See Iqbal*, 129 S. Ct. at 1949-50. Where there are well-pleaded factual allegations, I will assume the veracity of those facts and then determine whether they plausibly give rise to a valid claim for relief. *See id.*

## III. ERC's Motion to Dismiss the Second Amended Complaint

ERI has asserted two claims for relief in its Second Amended Complaint: (1) a request for declaratory judgment as to the rights and obligations of the parties under the ERI policy, the Hercules policy, and the Reinsurance Certificate and (2) an equitable contribution claim against

Vandalia and ERC for all or part of the verdict/settlement.  Despite indicating an intent to dismiss the entire Second Amended Complaint, in its motion ERC only seeks to dismiss ERI's claim for equitable contribution.[18]

As an initial matter, to resolve the question of whether ERI has stated a claim against ERC for equitable contribution, I must determine whether there are any pleadings which are conclusory and unsupported by factual allegations to satisfy my duty under under *Twombly* and *Iqbal*.  ERC does not argue that the factual allegations contained in the Second Amended Complaint are insufficient, but rather that the factual allegations cannot support a claim for equitable contribution as a matter of law.  After examining the Second Amended Complaint, which is described in detail above, I **FIND** that the factual allegations contained therein as to ERC's relationship with Vandalia and CAMC are well-supported and that none of the factual assertions are conclusory.  The Second Amended Complaint does much more than contain a formulaic recitation of the elements of equitable contribution, but rather ERI alleges details regarding ERC's status as a primary insurer, including a description of key contract provisions, citations to specific monetary amounts, and references to past dealings between the companies.  *Cf. Iqbal*, 129 S. Ct. at 1949.  Moreover, ERI attached its policy, the Hercules policy, and the Reinsurance Certificate in their entirety to the Complaint.  Accordingly, I will assume the veracity of ERI's allegations to determine whether they plausibly give rise to a valid claim for relief.  *See id.* at 1949-50.

---

[18]  Insofar as ERC is seeking to dismiss ERI's declaratory judgment action, the Motion is **DENIED**.  ERI may maintain a declaratory judgment action because there is a substantial live controversy between the parties, who have adverse interests, and this issue is of sufficient immediacy and reality to warrant the issuance of a declaration of rights.  *See* 28 U.S.C. § 2201(a); *Energy Corp. of Am. v. Bituminous Cas. Corp.*, 543 F. Supp. 2d 536, 541 (S.D. W. Va. 2008) (discussing standing requirements for a declaratory judgment action); *Majeed v. North Carolina*, 520 F. Supp. 2d 720, 724-25 (E.D.N.C. 2007).

In order to state a claim for equitable contribution against ERC, ERI must show that the companies insure the same entity (CAMC) and the same risk.  "For an insurer to be entitled to equitable contribution from other insurers, the policies in question must insure the same party, the same interest, and the same risk."  *Union Indem. Ins. Co. of N.Y.*, 614 F. Supp. at 1016; *see also, e.g., Lexington Ins. Co. v. Allianz Ins. Co.*, 177 Fed. Appx. 572, 574 (9th Cir. 2006); *State Farm Fire & Cas. Co. v. Zurich Ins. Co.*, 111 F.3d 42, 44 (6th Cir. 1997); *Aetna Cas. & Sur. Co. v. Chicago Ins. Co.*, 994 F.2d 1254, 1257 n.2 (7th Cir. 1993); *Clarendon Am. Ins. Co. v. Steadfast Ins. Co.*, 2008 WL 5221048, at *3 (S.D. Cal. Dec. 12, 2008).

> Equitable contribution 'applies to apportion costs among insurers that share the same level of liability on the same risk as to the same insured.'  Equitable contribution 'arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others.'

*Clarendon Am. Ins. Co.*, 2008 WL 5221048, at *3 (citing *Md. Cas. Co. v. Nationwide Mut. Ins. Co.*, 81 Cal. App. 4th 1082, 1089 (Cal. App. Ct. 2000)).

> This is known as double or overlapping insurance.  If one insurer pays the insured's entire loss in such a situation, that insurer is entitled to pro rata contribution from any other insurer who issued double insurance.  The purpose of the doctrine of equitable contribution is to prevent the insured from making a double recovery.

*Union Indem. Ins. Co. of N.Y.*, 614 F. Supp. at 1016-17 (citations omitted); *see also State Farm Fire & Cas. Co.*, 111 F.3d at 44.  The doctrine also prevents an insurer who does not pay from profiting at the expense of others.  *Am. Cont'l Ins. Co. v. Am. Cas. Co.*, 86 Cal. App. 4th 929, 937-38 (Cal. Ct. App. 2001).

In ruling on this particular motion, I need not resolve the issue raised by all of the non-moving parties, that is, whether ERC stands in the place of a primary insurer to CAMC, rather than

a reinsurer, and thus whether ERC and ERI insure the same *entity* (CAMC). Whether ERC is a primary insurer to CAMC becomes irrelevant because I **FIND** that ERI and ERC do not insure the same *risk*. ERI therefore has not stated a claim for equitable contribution against ERC. *See Am. Cas. Co. of Reading, Pa. v. Health Care Indem., Inc.*, 520 F.3d 1131, 1136-39 (10th Cir. 2008); *Lexington Ins. Co.*, 177 Fed. App'x at 573.

ERC argues that ERI has failed to state a claim against it upon which relief can be granted pursuant to Rule 12(b)(6) because ERC and ERI do not insure the same entity or risk. I **FIND** that, regardless of whether ERC stands in the place of a primary insurer to CAMC, ERI has not stated a claim for equitable contribution against ERC because they insure different risks. I have reached this conclusion because (1) the Hercules policy is in excess of the ERI policy with respect to Directors and Officers Liability coverage, and (2) the Hercules policy's Professional Liability and General Liability coverages insure different risks than the ERI policy's Director and Officers Liability coverage.

### A. ERI and ERC's Directors & Officers Liability Coverages do not insure the same risk because the Hercules policy is in excess to ERI's policy

ERC first maintains that ERI has not stated a claim for equitable contribution with respect to the Directors and Liability coverage under Group II of the Hercules Policy because that coverage is in excess of the ERI policy. ERC claims that the Hercules policy's Group II Directors & Officers Liability coverage is only triggered after the following has occurred: CAMC has paid its $2,000,000 self-insured retention, ERI has paid its full policy limits of $10,000,000, and National Union Fire Insurance Company of Pittsburgh has paid its full policy limits of $10,000,000.[19] ERC refers to the

---

[19] Schedule A contains the only mention of National Union Fire Insurance Company of
(continued...)

language of the Hercules policy and its attached Schedule of Underlying Insurance to support its argument.

By their very nature, primary and excess insurance policies do not insure the same risk. Primary insurance coverage is the first layer of insurance coverage which attaches immediately upon a covered occurrence or claim. *See Gauze v. Reed*, 633 S.E.2d 326, 332 (W. Va. 2006) (quoting Douglas R. Richmond, "Rights and Responsibilities of Excess Insurers," 78 Denv. U.L. Rev. 29-30 (2000)). Excess insurance coverage provides coverage above an underlying limit of primary insurance and is not triggered until the underlying primary policy limits have been paid. *Id.* Although West Virginia state law does not speak to this issue directly, West Virginia courts have recognized the difference between the levels of coverage in primary and excess insurance policies. *See id.* Because the West Virginia Supreme Court of Appeals has held that the doctrine of equitable contribution arises when there is a common obligation and one party has to pay more than its fair share of that obligation, the court would be unlikely to find such a common obligation in the context of primary insurers and excess insurers.[20] *See Mackey v. Irisari*, 445 S.E.2d 742, 747 (W. Va. 1994); *see also Ins. Co. v. Doctors Co.*, 299 F. Supp. 2d 1131, 1151-52 (D. Haw. 2003); *Reliance Nat'l Indem. Co. v. Gen. Star Indem. Co.*, 72 Cal. App. 4th 1063, 1078, 1080 (Cal. App. Ct. 1999); *cf. Am. Cas. Co. of Reading, Pa.*, 520 F.3d at 1137 (citing precedent where doctrine of equitable contribution applied to two excess insurers who insured the same risk at the same level of coverage

---

[19](...continued)
Pittsburgh in this litigation. That company is not a party, and I can only assume that its coverage is not implicated by this matter.

[20]   Moreover, I note that the parties in this matter agree that excess and primary insurers do not insure the same risk.

(citing *St. Paul Mercury Ins. Co. v. Underwriters at Lloyds of London, England*, 365 F.2d 659, 662

(10th Cir. 1966)).

I will now turn to the language of the Hercules policy to determine if its Group II Directors

and Liability coverage is an excess policy to ERI's coverage.  Group II of the Hercules policy covers

Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability.  (2d Am.

Compl., Ex. B at 2.)  The Hercules policy states that

> With respect to those coverages designated as Group II only, the COMPANY
> hereby agrees to indemnify THE INSURED against ULTIMATE NET LOSS **in**
> **excess** of the UNDERLYING LIMIT(S) OF LIABILITY set forth in the Schedule
> of UNDERLYING INSURANCE as set forth in Schedule A, which the
> INSURED is legally obligated to pay by reason of liability imposed by law or
> assumed under contract for DAMAGES to which this policy applies arising out
> of . . . . [Directors and Officers Liability].

(*Id.* at 3 (emphasis added).)  The Hercules policy goes on to explain that

> In addition to the indemnification of ULTIMATE NET LOSS . . . the COMPANY
> agrees to indemnify the INSURED against EXPENSES AND COSTS incurred
> and paid by the INSURED arising out of and in connection with claim which are
> covered under this policy, but:
> . . .
> 2. only after ULTIMATE NET LOSS and EXPENSES AND COSTS exceed the
> RETAINED AMOUNT with respect to those coverages designated as Group II
> as set forth in Item 5. of the Declarations.

(*Id.* at 3.)  "UNDERLYING INSURANCE" is defined as "the insurance policies set forth in

Schedule A. Schedule of UNDERLYING INSURANCE" and "'UNDERLYING LIMIT(S) OF

LIABILITY' means the limits of liability of the UNDERLYING INSURANCE and the

IMMEDIATE UNDERLYING INSURANCE set forth in Schedule A. Schedule of UNDERLYING

INSURANCE." (*Id.* at 10.)  "'IMMEDIATE UNDERLYING INSURANCE' means that layer of

UNDERLYING INSURANCE which immediately precedes the layer of excess insurance provided

by this policy." (*Id.* at 8.)  The Hercules policy incorporates those policies and states that "[t]he

-20-

COMPANY's obligation to indemnify the INSURED for loss in excess of the UNDERLYING LIMIT(S) OF LIABILITY applies only after the UNDERLYING LIMIT(S) OF LIABILITY have been paid by or on behalf of the NAMED INSURED." (*Id.* at 4, 10.) CAMC agreed in the Hercules Policy to maintain the "UNDERLYING INSURANCE." (*Id.* at 20.) Schedule A. Schedule of Underlying Insurance, indicates that Group II Directors and Officers Liability coverage is in excess of the coverage provided by National Union Fire Insurance Company of Pittsburgh, which is in turn in excess of ERI's coverage. (*Id.* at 22.) I **FIND** that the unambiguous language of Group II of the Hercules Policy, including Schedule A of that policy, demonstrates that its Directors and Officers Liability coverage is in excess of ERI's policy.[21]

ERI also argues that its own excess clause cancels out any excess provision in the Hercules Policy. ERC responds that ERI's excess clause does not apply in this case. Where more than one insurance policy includes an excess coverage provision, the excess coverage clauses are held to cancel each other out as mutually repugnant and each insurer is therefore liable to contribute to the settlement or judgment. *Md. Cas. Co. v. Cont'l Cas. Co.*, 189 F. Supp. 764, 772 (N.D. W. Va. 1960) ("[T]he excess insurance clauses must be completely disregarded, as they are all the same and mutually repugnant, and no one insurance company can be held to have primary liability."); *see also Philadelphia Indem. Ins. Co. v. Employers Ins. Co. of Wausau*, 318 F. Supp. 2d 170, 172 (S.D.N.Y. 2004); *Am. Alliance Ins. Co. v. IARW Ins. Co., Ltd.*, No. 97 C 4980, 1998 WL 214708, at *7 (N.D. Ill. April 24, 1998).

ERI's policy states in pertinent part that

---

[21]   ERI argues that there is no Schedule A attached to the Hercules policy, but appears to have been confused by ERC's citation of an incorrect exhibit number. Schedule A is located on page 22 of Exhibit B and is clearly a part of the Hercules policy.

> This Policy shall be excess of and not contribute with (1) other existing insurance, including but not limited to any insurance under which there is a duty to defend, unless such other insurance is specifically in excess of this Policy, and (2) indemnification to which an Insured is entitled from any other entity other than the Insured entity. This Policy shall not be subject to the terms of any other insurance.

(2d Am. Compl., Ex. A, at 11.)  ERI's policy language belies its argument because ERI's policy states that it is an excess policy "*unless* such other insurance is specifically in excess of this Policy." (*Id.* (emphasis added).)  As discussed above, Schedule A of the Hercules policy provides that its coverage is specifically in excess of the ERI policy.  ERI's excess clause is therefore inapplicable to this matter and is not mutually repugnant with the Hercules policy's excess clause.  I therefore **FIND** that ERC and ERI do not insure the same risk with regard to Directors and Officers Liability coverage because ERC is an excess insurer to ERI.  Accordingly, ERI has not stated a claim for equitable contribution against ERI as to that coverage.

### B. ERI's Directors & Officers Liability Coverage also insures a different risk from the Hercules policy's Professional Liability & General Liability Coverages

ERC also argues that ERI cannot claim equitable contribution with respect to the remaining coverages, that is, the Hercules policy's Professional Liability (Group I) or General Liability (Group III), because those coverages do not insure the same risks as the ERI policy, which only provides Directors and Officers Liability coverage.  I have already determined that the two policies' Directors and Officers Liability cover different risks because the Hercules policy is in excess to the ERI policy.  Moreover, Groups I and III of the Hercules policy cover different risks than the ERI policy as demonstrated by the different treatment of those risks within the Hercules policy.  According to ERC, the Hercules policy provides that if coverage exists under the Directors and Officers Liability

provision, then it is excluded under the Professional Liability and General Liability Coverages, and vice versa.

First, I will examine the ERI policy. It is undisputed that the ERI policy provides directors, officers and trustees' liability insurance and that ERI agreed to "pay on behalf of the **Insured Persons Loss** from **Claims** first made against them during the **Policy Period**, except for **Loss** which the **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification" and to "pay on behalf of the **Insured Entity Loss** from **Claims** first made against the **Insured Persons** during the **Policy Period** which the **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification." (2d Am. Compl., Ex. A, at 8.) The ERI policy defines a claim as "(1) written noticed received by an **Insured** that any person or entity intends to hold any **Insured** Responsible for a **Wrongful Act**, or (2) a legal, injunctive or administrative proceeding against an **Insured Person** solely by reason of his or her status as such." (*Id.*) An "**Insured Person**" is defined as "any past, present or future director, officer, trustee, employee, volunteer, or any member of the staff, faculty or any duly constituted committee of the **Insured Entity** . . ." (*Id.* at 9.) "**Wrongful Act**"

> means any actual or alleged error, omission, misstatement, misleading statement or breach of duty (1) by an **Insured Person** solely in his or her capacity as such, or while serving as a director or trustee of any other non-profit entity at the express written direction of the **Insured Entity**; or (2) with respect to coverage under Insuring Agreement C [OPTIONAL COVERAGE], by the **Insured Entity**.

(*Id.*)

I will now examine the Hercules policy allegedly issued by ERC. The Hercules policy provides three groups of coverage. They are designated in Item 5 of the Declarations as: Group I: HEALTH CARE PROFESSIONAL LIABILITY; Group II: Directors and Officers Liability, Employment Practices Liability and Fiduciary Liability; and Group III: All coverages provided

-23-

under this policy which are not listed in Group I and Group II above.  (*Id.*, Ex. B, at 2.)  Group II,

as I have discussed, is an excess policy.  (*Id.* at 3.)  Aside from its being an excess policy, however,

Group II insures the same type of risk or occurrence as the ERI policy, namely, liability arising by

virtue of the conduct of directors, officers, and trustees.[22]  As to Groups I and III, Vandalia agreed

to indemnify CAMC for an entirely different type of occurrence, namely,

> "HEALTHCARE PROFESSIONAL LIABILITY" (Group I) is defined as
> liability arising out of any act, error or omission:
>
>> 1. which results in an injury to a PATIENT, unless such injury arises from
>> a NAMED PERIL;
>>
>> 2. in the performance of the service by any persons or members of a
>> formal accreditation, standards review or similar board or committee of
>> the NAMED INSURED or a person charged with executing the directives
>> of such board or committee: or
>>
>> 3. in the furnishing of services related to the business operations of a
>> Health Maintenance Organization, Preferred Provider Organization or
>> similar organization which provides, or arranges to provide, healthcare
>> services to members under written contracts or agreements which set forth

---

[22]  With respect to Group II coverage, Vandalia agreed to indemnify CAMC

> against ULTIMATE NET LOSS in excess of the UNDERLYING LIMIT(S) OF
> LIABILITY set forth in the Schedule of UNDERLYING INSURANCE as set
> forth in Schedule A, which the INSURED is legally obligated to pay by reason
> of liability imposed by law or assumed under contract for DAMAGES to which
> this policy applies arising out of:
>
> Claims first made against the INSURED and reported to the COMPANY during
> the POLICY PERIOD for LOSS EVENT(S) classified as:
>
>> •   Directors and Officers Liability
>> •   Employment Practices Liability
>> •   Fiduciary Liability

(2d Am. Compl., Ex. B, at 3.)

a directory of participating physicians (where applicable), the scope of
healthcare services to be provided and the costs associated therewith.

(*Id.* at 7.)  Group III then provides coverage for "[a]ll coverages provided under this policy which

are not listed in Group I and Group II . . . ."  (*Id.* at 2.)[23]

Under the heading of "Exclusions," Hercules policy further provides that:

With respect to those coverages designated as Group I and Group III only, this
policy does not apply:

. . .

B.    to any liability for which coverage is provided, or would be provided
except for limits thereof or exclusions therein, by coverages designated in
Item 5. of the Declarations as Group II [Directors and Officers Liability].

(*Id.* at 12.)

Similarly,

With respect to those coverages designated as Group II. only, this policy does not
apply:

. . .

T.    to any liability for which coverage is provided or would be provided
except for limits thereof or exceptions therein, by coverages designated
in Item 5. of the Declaration as Group I and III.

(*Id.* at 14.)

_____

[23]   The policy defines "LOSS EVENT" as "an event, act, error or omission including
continuous or repeated exposure to the same conditions, which results in injury or damages neither
expected or intended from the standpoint of the INSURED for which coverage is otherwise afforded
under this policy."  (*Id.* at 9.)  A "LOSS EVENT" with respect to "HEALTH CARE
PROFESSIONAL LIABILITY" is defined as "an event, act, error or omission including continuous
or repeated exposure to the same conditions, which results in injury or damages for which coverage
is otherwise afforded under this policy."  (*Id.*)

The Hercules policy clearly provides insurance coverage for three different and distinct risks. The Hercules policy provides that if coverage exists under Directors and Officers Liability coverage, then coverage is excluded under the Health Care/Professional Liability and General Liability coverages, and vice versa.

Because Group II of the Hercules policy and ERI's policy cover the same type of occurrence, albeit at different risk levels, and because Group I and Group III cover risks that are different from Group II, I conclude that Groups I and III of the Hercules policy cover different risks than ERI. The ERI policy and Group II of the Hercules policy insure directors, officers, and trustees acting in their official capacity and who commit a wrongful act. By contrast, the Hercules policy's Health Care/Professional Liability provision covers injury to patients arising out of any act, error, or omission or the provision of health care services.[24] (2d Am. Compl., Ex. B, at 7.) And the General Liability coverage insures risks not otherwise covered by either type of coverage. Consequently, I **FIND** that ERI and ERC do not insure the same risk with regards to the remainder of the coverages in the Hercules policy.[25]

Based on the above analysis, I have determined that the ERI policy provides Directors and Officers Liability coverage, while the Hercules policy provides excess Directors and Officers Liability Coverage, Health Care/Professional Liability Coverage, and General Liability coverage.

---

[24] Under that definition, Group I would not provide coverage for the Underlying Litigation, as the parties seem to have acknowledged.

[25] My finding based on the language of the relevant insurance policies is consistent with the general purposes of these types of insurance coverage. An insurance policy providing directors' and officers' liability provides coverage for claims against the insureds for wrongful acts in their capacities as officers or directors. *See* Law of Corporate Officers & Directors: Indemnification & Insurance § 8:6 (West 2008). Professional liability coverage typically covers claims for damages based on professional services rendered. 43 Am. Jur. 2d Insurance § 704 (West 2009).

ERI has not stated a claim for equitable contribution against ERC because, even if ERI and ERC both insure CAMC, they do not insure the same risk. *See Am. Cas. Co. of Reading, Pa.*, 520 F.3d at 1136-39; *Lexington Ins. Co.*, 177 Fed. App'x at 573.  ERC's Motion to Dismiss ERI's Second Amended Complaint is hereby **GRANTED.**  The Second Amended Complaint is **DISMISSED in part** insofar as ERI is seeking equitable contribution from ERC.

**IV.  ERC's Motion to Dismiss CAMC's Cross-Claim**

I will now turn to ERC's Motion to Dismiss CAMC's Cross-claim for failure to state a claim under Rule 12(b)(6).  I **FIND** that CAMC has stated a claim for breach of contract and for unjust enrichment against ERC under Rule 12(b)(6).

**A.  CAMC has stated a claim for declaratory judgment**

As an initial matter, I note that ERC is not challenging CAMC's claim for declaratory judgment, but to the extent that ERC seeks a dismissal of the claims in their entirety, I have considered the issue.  I **FIND** it should not be dismissed because CAMC has demonstrated that there is a substantial live controversy between the parties, who have adverse interests, and this issue is of sufficient immediacy and reality to warrant the issuance of a declaration of rights or other legal relations.  *See* 28 U.S.C. § 2201(a); *Energy Corp. of Am.*, 543 F. Supp. 2d at 541 (discussing standing requirements for a declaratory judgment action); *Majeed*, 520 F. Supp. 2d at 724-25.

**B.  CAMC has stated a claim for breach of contract**

CAMC also asserts a breach of contract claim against ERC.  CAMC alleges that Vandalia is a straw man and that ERC therefore stands in Vandalia's shoes and is in privity of contract with CAMC.  As such, CAMC alleges that ERC has breached its contractual obligations to CAMC.

CAMC also contends that it has standing as a third-party beneficiary to assert such a breach of contract action and that ERC has waived the formalities of the CAMC–Vandalia–ERC relationship.

In its motion to dismiss CAMC's cross-claim against it, ERC contends that there is no valid, enforceable contract to support CAMC's breach of contract claim because ERC has no contract with CAMC. ERC argues that any attempt by CAMC to demonstrate that ERC is an assumption reinsurer to CAMC through ERC's conduct violates the parol evidence rule. Finally, ERC asserts that, even if there was such a contract, CAMC has not pled sufficient facts to show that it was breached or that CAMC was injured as a result of a breach.

To state a claim for breach of contract under Rule 12(b)(6), CAMC must allege facts sufficient to support the following elements: the existence of a valid, enforceable contract; that the plaintiff has performed under the contract; that the defendant has breached or violated its duties or obligations under the contract; and that the plaintiff has been injured as a result. *See* 23 Williston on Contracts § 63:1 (Richard A. Lord, ed. 4th ed. West 2009). To sufficiently state a claim for breach of contract, a plaintiff must allege in his complaint "the breach on which the plaintiffs found their action . . . [and] the facts and circumstances which entitle them to damages." *White v. Romans*, 3 S.E.2d 14, 16 (W. Va. 1887); *see also Charleston Nat'l Bank of Charleston v. Sims*, 70 S.E.2d 809, 813 (W. Va. 1952) (explaining that a plaintiff must show that it complied with the terms of the contract in order to allege a breach of contract claim); *Harper v. Consolidated Bus Lines*, 185 S.E. 225, 225-26 (W. Va. 1936) (finding that a complaint alleging the existence of a contract, the satisfaction of conditions precedent, the defendant's conduct constituting breach, and resulting damages is sufficient to state a claim for breach of contract); *Rhoades v. Chesapeake & O. Ry. Co.*, 39 S.E. 209, 211 (W. Va. 1901). If, however, the plaintiff can allege a breach of duty by the

defendant, then the court can infer that the plaintiff has suffered at least nominal damages sufficient to state a claim. *Harper*, 185 S.E. at 226.

ERC argues that CAMC has not alleged sufficient facts to state the following three elements of a breach of contract claim: that there was a valid, enforceable contract, that ERC breached such contract, and that CAMC was injured as a result. I disagree.

### 1. CAMC has alleged the existence of a valid, enforceable contract

ERC first contends that CAMC's breach of contract claim must be dismissed because there is no contract for primary insurance coverage between ERC and CAMC. Rather, ERC alleges that it is a reinsurer who entered into a contract of indemnity reinsurance with Vandalia, and Vandalia is CAMC's primary insurer. ERC alleges that CAMC therefore has no contractual relationship with it. As I will explain, although I conclude that CAMC has no contractual relationship with ERC under the Reinsurance Certificate, I **FIND** that CAMC has alleged sufficient facts to support its claim for breach of contract under a theory that CAMC and ERC subsequently modified or superceded that contract by dealing with each other directly.

### a.  ERC did not assume liability to CAMC under the Reinsurance Certificate

In arguing that ERC is not contractually liable to CAMC, ERC relies upon the principles of reinsurance to support its argument. A reinsurer generally is not directly liable to a primary insured. "Reinsurance is defined as 'insurance purchased by one underwriter from another, the latter wholly or partially indemnifying the former against the risks that it has assumed. The rights as between the underwriters are governed by the terms of the reinsurance contract.'" *Higginbotham v. Clark*, 432 S.E.2d 774, 780 (W. Va. 1993) (quoting Allan D. Windt, Insurance Claims and Disputes § 7.10 (2d ed. 1998)). Under a primary insurance contract, a primary insurer indemnifies the insured, while

-29-

under a reinsurance contract the ceding insurer (reinsured) cedes all or part of the risk from that primary insurance contract to another insurer (reinsurer). *See, e.g., British Ins. Co. of Cayman v. Safety Nat'l Cas.*, 335 F.3d 205, 211 (3d Cir. 2003).[26]

This type of standard reinsurance agreement is also known as an indemnity reinsurance agreement.  As the Supreme Court explained, in an indemnity reinsurance agreement

> it is the ceding company that remains directly liable to its policyholders, and that continues to pay claims and collect premiums. The indemnity reinsurer assumes no direct liability to the policyholders. Instead, it agrees to indemnify, or reimburse, the ceding company for a specified percentage of the claims and expenses attributable to the risks that have been reinsured, and the ceding company turns over to it a like percentage of the premiums generated by the insurance of those risks.

*Colonial Am. Life Ins. Co. v. Comm'r of Internal Revenue*, 491 U.S. 244, 247 (1989).  Accordingly, "[a] reinsurance contract confers no rights on the insured.  In fact, the reinsurer is not directly liable to the insured.  The reinsurer's only obligation is to indemnify the ceding insurer on the risk transferred." *British Ins. Co. of Cayman*, 335 F.3d at 211 (citations omitted).  Therefore, unless the contract between the parties provides otherwise, a reinsurer owes no duty to the insured because the insured is not a party to the reinsurance contract.  *See Higginbotham*, 432 S.E.2d at 780 ("Where a typical reinsurance contract is involved, 'there is no privity . . . between the original insured and the reinsurer; as a result, it is generally recognized that the original insured cannot recover directly from the reinsurer.'") (quoting Allan D. Windt, Insurance Claims and Disputes § 7.10)); *see also In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 611 N.Y.S.2d 506, 511-12 (N.Y. App. Div. 1994) ("[I]t is well-established that, a contract of reinsurance being one between the reinsurer and the

---

[26]  Reinsurance is typically intended to help an insurance company spread the burden of indemnification. *See Excess & Cas. Resins. Ass'n v. Ins. Comm'r of State of Cal.*, 656 F.2d 491, 492 (9th Cir. 1981).

insurer/reinsured, absent language in the policy indicating the reinsurer's intent to be directly liable
to the insured, the reinsurer has no obligation to the original insured . . . ."), *aff'd* 674 N.E.2d 313
(N.Y. 1996).

In an assumption reinsurance agreement, however, the reinsurer does become liable to the
primary insured.   Unlike in an indemnity reinsurance agreement, as part of an assumption
reinsurance agreement,

> the reinsurer steps into the shoes of the ceding company with respect to the
> reinsured policy, assuming all its liabilities and its responsibility to maintain
> required reserves against potential claims. The assumption reinsurer thereafter
> receives all premiums directly and becomes directly liable to the holders of the
> policies it has reinsured.

*Colonial Am. Life Ins.Co.*, 491 U.S. at 247; *see also Gerling Int'l Ins. Co. v. Comm'r of Internal
Revenue*, 839 F.2d 131, 133 n.1 (3d Cir. 1988) ("There are two main kinds of reinsurance
arrangements, indemnity reinsurance and assumption reinsurance.  In the former, the reinsurer
simply promises to indemnify the reinsured, i.e., the original insurer of the risk.  In the latter, the
reinsurer actually deals directly with the policyholder, replacing the reinsured."); *Modern Am. Life
Ins. Co. v. Comm'r of Internal Revenue*, 830 F.2d 110, 110 n.2 (8th Cir. 1987) ("Indemnity
reinsurance differs from assumption reinsurance in that under the former the reinsurer indemnifies
the reinsured company for losses, but does not become directly liable to policyholders, as it would
in the case of assumption reinsurance."); 44A Am. Jur. 2d Insurance § 1814 (West 2009) ("Strictly
speaking, reinsurance is the sale of an insurance policy to a ceding company, while an assumption
agreement results in the elimination of the ceding company's participation or interest in insurance
policies it sells to the company assuming the risks.").

"The existence of an assumption [reinsurance agreement] depends on proof of all the ordinary elements of novation, including the agreement of all parties to the new contract, and the extinguishment of the old one."  44A Am. Jur. 2d Insurance § 1814; *see also Sec. Benefit Life Ins. Co. v. F.D.I.C.*, 804 F. Supp. 217, 226 (D. Kan. 1992); 19 Couch on Insurance 2d § 80:64, at 670 (Rev. ed. 1983) ("Regardless of the nature of the reinsurance contract, the original insurer remains liable to the original insured, in the absence of a novation; that is, an original insurer cannot, without the knowledge or consent of the insured, enter into any contract of reinsurance with another company which abrogates or alters the rights of the insured against it, the insurer.").  A novation is a type of substituted contract that adds a party who was not a party to the original duty and which discharges the original duty.  Restatement (Second) of Contracts § 280 (1981).

To determine whether ERI is an assumption reinsurer with direct contractual liability to CAMC, I will begin with the language of the Reinsurance Certificate.  A reinsurance contract must be interpreted like any other contract to ascertain the intent of the parties, a proposition with which all of the parties to this case agree.  *See In re Acceptance Ins. Cos. Inc.*, 567 F.3d 369, 378-79 (8th Cir. 2009).  Accordingly, I must determine whether the language of the relevant contracts is clear and unambiguous.  "Language in an insurance policy should be given its plain, ordinary meaning." Syl. pt. 1, *Soliva v. Shand, Morahan & Co., Inc.*, 345 S.E.2d 33 (W. Va. 1986), *overruled on other grounds by Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc.*, 356 S.E.2d 488 (1987).  "It is well-established that '[w]here the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended.'" *Blankenship v. City of Charleston*, __ S.E.2d __, 2009 WL 1740184, at * __ (W. Va. June 18, 2009) (quoting Syl. pt. 1, *Christopher v. U.S. Life Ins. Co.*, 116 S.E.2d 864 (1960));

*see also, e.g., Kopf v. Lacey*, 540 S.E.2d 170, 175-76 (W. Va. 2000);  Syl. pt. 2, *Orteza v. Monongalia County Gen. Hosp.*, 318 S.E.2d 40 (W. Va. 1984) ("Where the terms of a contract are clear and unambiguous, they must be applied and not construed.").

The language of the Reinsurance Certificate reveals that it is an indemnity reinsurance agreement, not an assumption reinsurance agreement.  When courts have found a contract to be an assumption reinsurance agreement rather than a contract of indemnity, they  have relied upon explicit language of assumption that is entirely absent from the Reinsurance Certificate.  *See, e.g., Cleveland v. Commonwealth Nat'l Ins. Co.*, 269 F. Supp. 2d 752, 756 (S.D. Miss. 2003) (classifying a contract as an assumption reinsurance agreement based on the contract's language, including, "'[i]t is the intent of the parties to this Agreement to accomplish . . . a complete transfer of all of the Company's contractual rights, obligations, liabilities and risks with respect to the [policies] then being assumed to the Reinsurer, with the Result that the Reinsurer . . . shall succeed the Company as the insurer . . . as though the Reinsurer had originally issued such Assumed Policies, and to transfer to the Reinsurer . . . full and complete responsibility for servicing and administering the Assumed Policies . . . ."); *State Dep't of Pub. Welfare v. Cent. Standard Life Ins. Co.*, 120 N.W. 2d 687, 691-92 (Wis. 1963) (describing the assumption reinsurance contract which ceded all of the reinsured's insurance policies to the reinsurer, and in which the reinsurer assumed all the liabilities under those policies, agreed to send policyholders certificates of assumptions, and agreed to investigate, settle, defend, and bear expenses of all claims on those policies); *see also* 10 Am. Jur. Legal Forms 2d § 149:34 (West 2009) (example of an assumption clause in reinsurance agreement). By contrast, the Reinsurance Certificate shows that Vandalia remained CAMC's primary insured

and retained rights and responsibilities to ERC as a reinsured even though ERC agreed to indemnify 100% of the Hercules policy's limits.  (2d Am. Compl., Ex. C at 1.)

For instance, the Reinsurance Certificate names Vandalia as the Reinsured and CAMC as the insured.  Vandalia agreed to pay an annual premium of $2,573,899 to ERC, and ERC agreed to "indemnify the Reinsured against that proportion of 'claim expenses' paid by the Reinsured that the amount of the loss ultimately borne by the Corporation bears to the total amount of the loss."  (*Id.* at 1-2.)  Vandalia further agreed to investigate and settle or defend all claims arising under the reinsured policy.  Vandalia agreed to meet certain notice requirements in which it would notify ERC according to the contract's terms.  More specifically, Vandalia was required to give notice to ERC of certain types of losses or events which might result in a claim for indemnity, and Vandalia agreed to forward copies of all pleadings and investigation reports to ERC.  (*Id.*)  Moreover, "[a]s a condition precedent to indemnification hereunder, [Vandalia] [was required to] notify and obtain the prior, written approval of [ERC] of any payment or offer of settlement for any claim that would involve indemnification under this certificate."  (*Id.*)  That section goes on to state that "[n]otice to the Reinsured by any insured does not constitute notice to [ERC]."  (*Id.*)

The unambiguous language of the Reinsurance Certificate demonstrates that ERC entered into an indemnity reinsurance agreement, not an assumption reinsurance agreement.  The language of the Reinsurance Certificate states that ERC agreed to "indemnify" Vandalia and there is nothing in the contract to suggest that ERC assumed all of Vandalia's rights and responsibilities under the Hercules policy, or that CAMC agreed to such an arrangement.  Furthermore, the Reinsurance Agreement does not provide that ERC assumed responsibility for servicing and administering the Hercules policy in place of Vandalia.  On the contrary, Vandalia retained many such responsibilities.

-34-

There is no language in the Reinsurance Certificate indicating ERC's intention to be directly liable to CAMC, the primary insured, or that a novation occurred. *See Cleveland*, 269 F. Supp. 2d at 756-57; *see also Sec. Benefit Life Ins. Co. v. F.D.I.C.*, 804 F. Supp. at 226; *In re Integrated Resources Life Ins. Co.*, 562 N.W. 2d 179, 182 (Iowa 1997); *Donohew*, 352 S.E.2d at 735.

ERI, Vandalia, and CAMC's arguments to the contrary are unpersuasive. Although ERC agreed to indemnify 100% of the Hercules policy, that does not automatically indicate that the Reinsurance Certificate is an assumption reinsurance agreement. An indemnity reinsurance agreement can involve the transfer of *all* of the reinsured's liability on the policy. *See Higginbotham*, 432 S.E.2d at 780; *see also Colonial Am. Life Ins. Co. v. Comm'r of Internal Revenue*, 843 F.2d 201, 202 (5th Cir. 1988), *aff'd* 491 U.S. 244 (1989).

Additionally, despite the non-moving parties' arguments that CAMC's direct premium payments to ERC demonstrate that ERC did assume all of Vandalia's rights and obligations to CAMC, the Reinsurance Certificate itself gives no indication that CAMC rather than Vandalia should pay the premium to ERC. The Reinsurance Certificate provides that Vandalia would pay ERC an annual premium of $2,573,899, and that the "premium payment must be received within 30 days of the effective date." It does not provide that CAMC would pay premiums directly to ERC or that ERC become directly liable to CAMC.[27]

Also, this case is not governed, as ERI, Vandalia, and CAMC contend, by *Delp v. Missouri State Life Insurance Company*, 182 S.E. 580 (W. Va. 1935). In that case, the West Virginia

---

[27]   I also note that the premiums due under the Hercules policy and the Reinsurance Certificate are different amounts: $2,573,988 and $2,573,899 respectively. Although one could imagine that the difference between the amounts is a typo in which numbers were juxtaposed, there is no evidence in either contract that the premium amounts are in error or are otherwise ambiguous. Accordingly, I find the fact that the premium amounts under the two contracts are not identical and are not be further evidence of the intent to enter into any type of assumption agreement.

Supreme Court of Appeals held that a reinsurer who had contracted with the reinsured to assume the

primary insurance policy was directly liable to the original insured:

> The effect of a strictly technical contract of reinsurance is merely to indemnify the
> original insurer, and, accordingly, the policyholder is not in privity with the
> contract and may not sue the reinsurer by reason thereof; but where the contract
> of reinsurance is to pay the policyholder the amount of any loss which may
> accrue, it is generally held that the policyholder may sue the reinsurer on the
> policy.

*Id.* at 581-82.  But *Delp* is distinguishable.  In that case, the reinsurance contract specifically

provided for the assumption of such liability and the court accordingly found that the reinsurer was

liable "to the extent of the obligations assumed by it under the contract . . . ."  *Id.* at 582.  In this

case, there is no such explicit assumption in the language of the Reinsurance Certificate.[28]

---

[28]  I will briefly distinguish the other cases relied upon by the non-moving parties.  ERI and
CAMC rely upon *Koken v. Villanova Insurance Company*, 878 A.2d 51 (Pa. 2005), affirming *Koken
v. Legion Insurance Company*, 831 A.2d 1196 (Pa. Commw. Ct. 2003), to support their argument
that CAMC should have a direct right of recovery against ERC because Vandalia was merely a pass-
through company.  That case, however, is not persuasive because it occurred in a unique context
involving insolvency and Pennsylvania law regarding third-party beneficiaries.  *Koken* was an
insolvency case in which the original insureds sought direct access to reinsurance proceeds from a
captive reinsurer to avoid those proceeds becoming part of the liquidation of the insurers.  In that
case, the Pennsylvania court considered the equitable purpose and principles of rehabilitation and
liquidation and primarily was concerned with protecting the customers of insurance.  *Id.* at 1232-33.
The court permitted such access to give effect to the reasonable expectations of policyholders in
light of the fact that such access would not adversely affect the estate and because the policyholders
had a contractual right, as third-party beneficiaries, to payment by the reinsurer.  *Id.* at 1246.  In so
finding, the court relied only upon insolvency cases.  *Id.* at 1234-35 (discussing, *inter alia*, *Mellon
v. Sec. Mut. Cas. Co.*, No. 3022, 1991 WL 207373 (Pa. Com. Pl. 1981)).  Moreover, Pennsylvania
law allows policyholders to bring a direct action against the reinsurer if they qualify as a third-party
intended beneficiary under the reinsurance contract.  *Id.* at 1236-37.  The *Koken* court found the
insureds to be third-party beneficiaries by examining the parties' conduct, not the contracts
themselves.  *Id.* at 1237-39.  This is in direct conflict with controlling West Virginia law which
requires that, in determining whether a non-party may sue on the contract, "[t]he intent of the
contracting parties must appear from the contract or be shown by necessary implication; and be in
accordance with the parol evidence rule when the contract under consideration is in writing."  *See
United Dispatch v. E.J. Allbrecht Co.*, 62 S.E.2d 289, 294-96 (W. Va. 1950); *see also E. Steel
Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 277-78 (W. Va. 2001)*; Robinson v. Cabell*
(continued...)

-36-

Accordingly, the unambiguous language of the Reinsurance Certificate reveals that ERC and Vandalia entered into a standard indemnity reinsurance agreement.  I **FIND** that CAMC was not given a direct right of recovery against ERC under the Reinsurance Certificate and ERC did not contractually assume any liability toward CAMC.

I may not use the parties' extra-contractual actions to alter the unambiguous terms of the Reinsurance Certificate.  Courts are barred by the parol evidence rule from considering prior or contemporaneous oral statements or other extrinsic evidence in order to vary, contradict, add to, or explain the terms of an unambiguous written contract.  *See* 7B Michie's Jurisprudence Evidence § 130, at 278 (1998).  ERI, Vandalia, and CAMC urge me to consider this evidence because the extra-contractual actions by ERC and CAMC, such as CAMC's direct payment of premiums to ERC and ERC's continued acceptance of such payments, demonstrate that Vandalia was only a straw man for the real primary insurer, ERC.  ERI, Vandalia, and CAMC claim that I may consider parol evidence in this matter because the Reinsurance Certificate is ambiguous in that it does not clearly define the parties' rights and obligations toward CAMC.

As my previous discussion of that contract demonstrates, I do not agree that the Reinsurance Certificate is ambiguous.  The West Virginia Supreme Court of Appeals "has repeatedly held that [a] valid written instrument which expresses the intent of the party in plain and unambiguous

---

[28](...continued)
*Huntington Hosp., Inc.*, 498 S.E.2d 27, 32-33 (W. Va. 1997).

Similarly, *Great Atlantic Life Insurance Company v. Harris* is distinguishable because the reinsurance contract itself designated the original insured as a third-party beneficiary.  723 S.W.2d 329, 333-34 (Tex. App. 1987).

*Mellon v. Security Mutual*, 5 Phila. Co. Rptr. 400 (Pa. Comm Pl. 1981), also involved insolvency.  In that case, the court found that the reinsurance contract had not given the original insured a direct right of action against the reinsurer and that the original insured was not a third-party beneficiary to the reinsurance contract.

language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent."  *Kopf*, 540 S.E.2d at 175 (citations omitted; internal quotation marks omitted); *see also Blankenship*, 2009 WL 1740184.  Although "[e]xtrinsic evidence may be used to aid in the construction of a contract if the matter in controversy is not clearly expressed in the contract . . . where the language of a contract is clear the language cannot be [so] construed and must be given effect and no interpretation thereof is permissible." *Berkeley County Pub. Serv. Dist. v. Vitro Corp.*, 162 S.E.2d 189, 200 (W. Va. 1968).

As I have explained, under the Reinsurance Certificate it is clear that ERC did not assume any rights and obligations towards CAMC.  Accordingly, I may not change the terms of the agreement despite the potentially harsh and even unreasonable result implicated by the allegations regarding these parties' extra-contractual relationships. *See Lowe v. Albertazzie*, 516 S.E.2d 258, 265 (W. Va. 1999).  Vandalia is the primary insurer for CAMC, and ERC is Vandalia's reinsurer with no direct relationship to CAMC.  I therefore may not consider the Hercules policy or the evidence of the parties' outside relationship to determine whether the Reinsurance Certificate establishes ERC as CAMC's primary insurer.[29]

---

[29] I consider the Hercules policy to be part of the extrinsic evidence I may not consider under the parol evidence rule because it was entered into before the Reinsurance Certificate.  The contracts do not refer to or incorporate each other, are different types of contracts (insurance versus reinsurance), and were entered into by different parties. Accordingly, it is not appropriate to read these two contracts together in attempting to interpret them. *See Hitachi Credit Am. Corp. v. Signet Bank,* 166 F.3d 614 (4th Cir. 1999); *cf., e.g., Bachmann v. Glazer & Glazer, Inc.,* 559 A.2d 365, 415 (Md. 1989) ("When a contract is comprised of more than one document, the writings are to be read and construed together as if they were one instrument."); *Café Assocs., Ltd. v. Gerngross,* 406 S.E.2d 162, 164 (S.C. 1991) (holding that contracts executed by the same parties for the same purpose and during the course of the same transaction should be read together); *Ellie, Inc. v. Miccichi*, 594 S.E.2d 485, 492 (S.C. Ct. App. 2004) ("[T]wo contracts executed at different times relating to the same subject matter, entered into by the same parties, are to be construed as one contract and considered as a whole").

(continued...)

### b. CAMC is not a third-party beneficiary to the Reinsurance Certificate

CAMC further argues that it is a third-party beneficiary of the Reinsurance Certificate because ERC established Vandalia as a pass-through company which was created for CAMC's benefit. CAMC contends that the traditional reinsurance relationship, wherein the insured is precluded from claiming the status of a third-party beneficiary, does not exist between CAMC, Vandalia, and ERC. In so arguing, CAMC relies upon *Delp* and *Koken*, where third-party beneficiary standing was recognized in the reinsurance context, but which I have already distinguished as inapplicable to this case.

"It is well-established that a contract of insurance is a personal contract between the insurer and the insured named in the policy." *Mazon v. Camden Fire Ins. Ass'n*, 389 S.E.2d 743, 745 (W. Va. 1990) (citations omitted). West Virginia Code § 55-8-12 provides that a third party may sue on

---

[29](...continued)

Moreover, even if I were to consider the Hercules policy, the language of the Hercules policy demonstrates that Vandalia has retained some rights and responsibilities as a primary insurer and has not ceded all rights and responsibilities to CAMC, including an obligation to indemnify the insured over the retention amount, the right to associate with CAMC in the defense of any claim, suit or proceeding, and the right to discharge its obligation if Vandalia were to recommend the settlement of an amount that CAMC unreasonably refused to pay. (2d Am. Compl., Ex. B at 15.) Additionally, the Hercules policy requires CAMC to provide notice to Vandalia before accepting or making an offer of settlement as well as notice of any claim, suit or proceeding that may have a value above 25% of the retained amount. (*Id.* at 16-17.) CAMC is also required to report to Vandalia any claim, suit or proceeding involving certain injuries such as brain damage, birth-related injuries, anesthesia related injuries, loss of limb, or unanticipated death. (*Id.* at 17.) The Hercules policy obviously provides for a type of captive relationship between CAMC and Vandalia because the premium included captive fees and because CAMC assumed so many obligations under the policy. (*Id.* at 16.) However, it also provides that Vandalia retained some rights and responsibilities as a primary insurer and Vandalia did not cede all rights and responsibilities to CAMC. Significantly, the Hercules policy contains no reference to a reinsurance policy or to ERC. Accordingly, because Vandalia was clearly more than a straw man, I would not find based on the two insurance contracts that ERC was a primary insurer to CAMC.

contract to which he is not a party only if that contract was made for his sole benefit.[30]  *See also Robinson*, 498 S.E.2d at 32-33.   Similarly, in a contract of indemnity, which I have found the Reinsurance Certificate to be, the only person entitled to sue on that contract is the indemnitee—a third person who is not a party to the contract of indemnity and for whose benefit it was not made may have a right to bring a cause of action against the indemnitee but is not entitled to sue on the indemnity contract.  *See Commercial Bank of Bluefield v. St. Paul Fire & Marine Ins. Co.*, 336 S.E.2d 552, 558-59 (W. Va. 1985).  Accordingly,

> [i]n the absence of a provision in a contract specifically stating that such contract shall inure to the benefit of a third person, there is a presumption that the contracting parties did not so intend and in order to overcome such presumption the implication from the contract as a whole and the surrounding circumstances must be so strong as to be tantamount to an express declaration.

Syl. pt. 2, *Ison v. Daniel Crisp Corp.*, 122 S.E.2d 553 (W. Va. 1961).  In the complete absence of any indication from the contract itself that it was intended to benefit a third-person, courts will not go outside of the contract and examine the surrounding circumstances to find a third-party beneficiary.  *See Robinson*, 498 S.E.2d at 32-33; *E. Steel Constructors, Inc.*, 549 S.E.2d at 277-78.

    As I have discussed, the Reinsurance Certificate is an indemnity reinsurance agreement entered into by Vandalia and ERC and to which CAMC is not a party.  The contract gives no indication whatsoever that CAMC is a third-party beneficiary or that the Reinsurance Certificate was entered into solely for the benefit of CAMC.  Under the terms of that contract, as with any standard indemnity reinsurance agreement, the only parties benefitted by its terms were ERC and Vandalia.

---

[30]  West Virginia Code § 55-8-12 provides:
    If a covenant or promise be made for the sole benefit of a person with whom it is not made, or with whom it is made jointly with others, such person may maintain, in his own name, any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party making such covenant or promise.

*See In re Liquidation of Union Indem. Ins. Co. of N.Y.*, 611 N.Y.S.2d at 511-12 ("[I]t is well-established that, a contract of reinsurance being one between the reinsurer and the insurer/reinsured, absent language in the policy indicating the reinsurer's intent to be directly liable to the insured, the reinsurer has no obligation to the original insured, which cannot claim the status of a third-party beneficiary."). Consequently, I **FIND** that CAMC is not a third-party beneficiary to the Reinsurance Certificate and has not stated a breach of contract claim under that theory.

### c.  CAMC cannot use the doctrines of waiver and estoppel to create an insurance contract

CAMC also claims that ERC has waived the formalities of the reinsurer relationship through its actions and "is therefore estopped from attempting to hide behind the formalities of Vandalia in order to attempt to deny coverage to CAMC." (CAMC Cross-Claim ¶ 48.)  CAMC argues that ERC may by its own conduct waive certain contractual requirements, and that if the "real facts speak for themselves . . . the snake [i.e., the primary insurer] will be revealed."[31] (CAMC's Resp. 14 [Docket 46].)[32]

Contractual provisions or rights may be waived by subsequent agreement of the parties, and such a waiver may be demonstrated by the use of parol evidence.  *See Ohio Valley Contractors, Inc. v. Bd. of Educ. of Wetzel County*, 391 S.E.2d 891, 894 n.5 (W. Va. 1980); *Mundy v. Arcuri*, 267

---

[31]  CAMC employs a "cat versus snake" analogy, somewhat over-enthusiastically, in an attempt to draw my attention to the equities of this case and to illustrate the difference between a traditional reinsurance relationship where there is a "body" in between the reinsurer and the primary insured (i.e., the cat who has a head and tail separated by such a body) and the relationship in this case where Vandalia (the body) does not exist, thus constituting a snake rather than a cat.

[32]  A word of clarification: in response to the instant Motion to Dismiss filed after the Second Amended Complaint, Vandalia and CAMC filed a Joint Response in Opposition [Docket 66] in which they did not argue against the Motion, but merely adopt their earlier filings in response to ERC's Motions to Dismiss filed after the First Amended Complaint.  Accordingly, my references to earlier filings which would seem to be unrelated to the instant motion are correct.

S.E.2d 454 (W. Va. 1980). "To establish waiver, there must be evidence demonstrating that a party has intentionally relinquished a known right." *Potesta v. U.S.F. & G.*, 504 S.E.2d 135, 142 (W. Va. 1998); *see also* 19 Michie's Jurisprudence Waiver § 2-3 (1991). The burden to establish waiver rests on the one asserting waiver, and waiver is never presumed. *See Potesta*, 504 S.E.2d at 150. "A party asserting and relying upon a waiver must establish it by evidence, and must show the waiver claimed to have been made with full knowledge by the party against whom it is claimed." 19 Michie's Jurisprudence Waiver § 5, at 678.

Estoppel applies when a party is induced to act or refrain from acting because of its reasonable reliance on another party's misrepresentation or concealment of a material fact. *See Potesta*, 504 S.E.2d at 143-44. In the insurance context, the elements of an estoppel action against an insurer are conduct on the part of the insurer which is sufficient to justify a reasonable belief on the part of the insured that the insurer will not insist on compliance with the provisions of the policy and that the insured in reliance upon such conduct or acts has changed his position to his detriment. Syl. pt. 4, *Knapp v. Independence Life & Accident Ins. Co.*, 118 S.E.2d 631 (W. Va. 1961). As with waiver, the burden of proving estoppel lies with the party who asserts the doctrine. *Mundy*, 267 S.E.2d at 457.

Generally, as ERC points out, "the principles of waiver and estoppel are inoperable to extend coverage beyond the terms of an insurance contract." *Potesta*, 504 S.E.2d at 142. ERC is right. CAMC's waiver and estoppel argument is fundamentally flawed because neither doctrine supports the existence of a contract where it has not yet been established. Specifically, I **FIND** that CAMC has not alleged that ERC waived any specific rights or provisions of the existing contracts, but seems to be arguing that ERC waived the terms of the Reinsurance Certificate entirely. Waiving the

-42-

indemnity provisions of the contract would just leave holes in the Reinsurance Certificate.  ERC's waiver would not have resulted in the creation of an entirely new assumption agreement.  I also **FIND** that CAMC has not alleged any facts supporting a claim of estoppel because CAMC is not seeking to excuse its noncompliance with an existing insurance contract (and therefore to extend its coverage), but rather to create an entirely new contract of insurance between CAMC and ERC.  The doctrine of estoppel cannot be used to create a contract of insurance.  *See Knapp*, 118 S.E.2d at 637 (citing *Md. Cas. Co. v. Indus. Comm'n*, 284 N.W. 36 (Wis. 1939)).

> ### d. CAMC has stated a claim for breach of contract under the theory that CAMC and ERC may have abrogated or modified the Reinsurance Agreement

Extrinsic evidence of the parties post-contractual relationship and actions can be used in this matter to demonstrate that CAMC and ERC may have abrogated or modified the Reinsurance Certificate and entered into a new contract.  A party is not required to plead any specific legal theories to state a valid claim for relief, but are only required to plead sufficient facts from which it could claim a right of recovery, regardless of the particular legal theory.  *See Flagstar Bank, FSB v. First Citizens Bank & Trust Co., Inc.*, No. 3:09-876-CMC, 2009 WL 1707941, at *2 (D.S.C. June 17, 2009) ("The Rule 12(b)(6) standard has often been expressed as precluding dismissal unless it is certain that the plaintiff is not entitled to relief under *any legal theory* that plausibly could be suggested by the facts alleged.") (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999); *Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005); *Thompson v. Washington*, 362 F.3d 969, 970-71 (7th Cir. 2004); *Haddock v. Bd. of Dental Examiners of Cal.*, 777 F.2d 462, 464 (9th Cir.1985) (stating that a complaint "should not be dismissed if it states a claim under any legal theory, even if the plaintiff

erroneously relies on a different legal theory"); *John W. Lodge Distrib. Co., Inc.*, 245 S.E.2d at 158-59.  This principle remains true after *Twombly.  See, e.g., Flagstar Bank, FSB*, 2009 WL 1707941, at *2; *Brant v. Kipp*, No. CV 08-8320 AHM (RZx), 2009 WL 1444691, at *2 (C.D. Cal. May 21, 2009).  I acknowledge that ERI, Vandalia, and CAMC never argue that a modification or abrogation occurred, but I **FIND** that the facts alleged by CAMC are sufficient to state a claim for relief under that theory.[33]

I can consider subsequent evidence to demonstrate that the parties entered into a new contract, upon consideration, which abrogates prior written contracts or that the parties engaged in a course of conduct which constituted a modification.  *See* 7B Michie's Jurisprudence Evidence § 130, at 281 (1998); *see also CMC Enter., Inc. v. Ken Lowe Mgmt. Co.*, 525 S.E.2d 295, 298 (W. Va. 1999); *Thomas v. Gray Lumber Co.*, 486 S.E.2d 142, 148 (W. Va. 1997); *State ex rel. Coral Pools, Inc. v. Knapp*, 131 S.E.2d 81, 86 (W. Va. 1963) (holding that a prior written contract may be modified or supplemented by a subsequent valid oral contract).  "It is a well-established, fundamental principle of contract law that a valid, unambiguous written contract may be modified or superceded by a subsequent contract based on a valuable consideration." *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 245 S.E.2d 157, 159 (W. Va. 1978).  A subsequent oral contract must be based on valuable consideration and the burden of proving an oral modification is high.  *Id.*; *see also Wilkinson v. Searls*, 184 S.E.2d 735, 741 (W. Va. 1971); Syl. pt. 2, *Jones v. Kessler*, 126 S.E. 344 (W. Va. 1925);17A Am. Jur. 2d Contracts § 512 (West 2009).  The burden rests on the party seeking to establish the modification, who must demonstrate by "clear and positive evidence that there was

---

[33]  They rather are contending that ERC, Vandalia, and CAMC entered into the Reinsurance Agreement and the Hercules policy with the intention to create a primary insurance relationship between CAMC and ERC, an intention expressed both in the contracts and the subsequent actions of the parties, and have breached those agreements.

a meeting of the parties' minds on the modification.  *Id.* (quoting Syl. pt. 4, *Bischoff v. Francesa*, 56 S.E.2d 865 (W. Va. 1949)).

> [A]n oral contract changing the terms of a written contract must be so specific and direct that it leaves no doubt that the parties intended to change what they previously solemnized by formal contract.  And, even when that burden has been met, the new contract will be held to depart from the first only to the extent that its terms are inconsistent with the written document.

*Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749, 754 (W. Va. 1986).

I **FIND** that CAMC has alleged sufficient factual allegations to support its claim that ERC has a direct contractual relationship with CAMC because the Hercules policy and the Reinsurance Certificate may have been modified or abrogated by a subsequent agreement or understanding between ERC, Vandalia, and CAMC.[34]  Taken as true, the alleged facts demonstrate that CAMC paid premiums to ERC for over twenty-five years, and that ERC accepted those payments as a possible form of consideration.  (CAMC Cross-Claim ¶¶ 22, 40.)  Notice of claims never came to ERC from Vandalia, but either came from CAMC through Myron Steves, Inc. or directly to ERC. (*Id.* ¶ 41.)  CAMC has alleged that all communications and coordination that the Reinsurance Certificate designates as Vandalia's responsibility were routinely handled by CAMC.  (*Id.* ¶¶ 42, 44.)  CAMC has alleged that ERC dealt with CAMC directly and, until the present case, operated as though ERC, and not Vandalia, was the primary insurer of CAMC.  ERC and CAMC's extra-contractual relationship sufficiently demonstrates that they either agreed upon the modification to allow ERC to assume Vandalia's obligations to CAMC or agreed to create a new contract between ERC and CAMC that abrogated the terms of the Hercules policy and the Reinsurance Certificate.

---

[34]  Again, I note that a party does not need to explicitly plead the existence of an implied contract, but must plead sufficient facts which establish the plausible existence of such an implied. *See Marshall v. Elmo Greer & Sons, Inc.*, 456 S.E.2d 554, 557 & n. 2 (W. Va. 1995).

Although CAMC may not be able to meet the high burden of demonstrating such a modification or abrogation on the merits of this issue, CAMC has alleged sufficient facts to support the elements of such a claim.  CAMC has therefore pled sufficient facts that, taken as true, demonstrate that ERC and CAMC may have created a primary insurance contract as demonstrated by their subsequent actions outside of the Reinsurance Certificate and Hercules policy.[35]  CAMC has therefore stated a claim for the first element of breach of contract: the existence of a valid, enforceable contract.

### 2.  CAMC has alleged that ERC breached a contract with CAMC

ERC also argues that, even if there was a contract between ERC and CAMC, CAMC has not pled sufficient facts to show that the contract was breached.  ERC contends that CAMC has not claimed to have paid more than its self-insured retention amount or stated facts identifying *how* ERC breached its obligations to CAMC.  ERC views CAMC's factual assertions, including the statement that ERC denied coverage and is in breach of its obligations, as conclusory.

I **FIND** that CAMC has alleged sufficient facts, which taken as true, show that ERC has breached a contractual obligation to CAMC.  In its cross-claim, CAMC alleges that "ERC is attempting to hide behind the arrangement that it helped create [between ERC and Vandalia] and substantially profited from in order to deny coverage in this case."  (CAMC Cross-Claim ¶ 47; *see also id.* ¶ 48.)  CAMC further asserts that "ERC has, to date, refused to honor its obligations under the ERC Reinsurance agreement and the Hercules policy.  As such, ERC is in breach of its

---

[35]     Of course, I remain barred by the parol evidence rule from considering any *prior* or *contemporaneous* oral statements, negotiations, or agreements.  *See Yoho v. Borg-Warner Chems.*, 406 S.E.2d 696, 697 (W. Va. 1991) ("[W]here the terms of a written instrument are unambiguous, clear and explicit, extrinsic evidence of statements of any of the parties to it made contemporaneously with or prior to its execution is inadmissible to contradict, add to, detract from, vary or explain its terms, in the absence of fraud, accident or mistake in its procurement." (quoting *Kanawha Banking & Trust Co. v. Gilbert*, 46 S.E.2d 225, 232-33 (W. Va. 1947))).

obligations under the ERC Reinsurance agreement and the Hercules policy." (*Id.* ¶ 52.)  Because CAMC alleges that ERC has denied coverage to CAMC, I can infer that CAMC has made some sort of a claim or demand for coverage from ERC.  ERC then allegedly has breached a contract with CAMC by denying that coverage, and CAMC has pled sufficient factual allegations to establish the element of breach.[36]

### 3. CAMC has alleged that it suffered an injury from ERC's breach

In arguing that CAMC has not stated a claim for breach of contract, ERC finally asserts that CAMC has failed to allege any facts showing that it was injured by any breach.  ERC points out that CAMC has not alleged that it has paid more than its self-insured retention amount.

Recoverable damages in an action for breach of contract cannot be too remote, contingent or speculative, but must consist of actual facts from which a reasonably accurate conclusion could be drawn regarding the cause and amount of such damages.  *See Commonwealth Tire Co. v. Tri-State Tire Co.*, 193 S.E.2d 544, 550 (W. Va. 1972).  I view CAMC's potential liability for additional settlement payments after the resolution of the parties' requests for declaratory judgment as too remote and speculative to support CAMC's claim that it was injured by ERC's breach of a contract.

However, the facts alleged do demonstrate that CAMC has incurred attorneys' fees, inconvenience, delay and other costs as a result of such refusal which spawned this litigation.[37]

---

[36]   Moreover, even if such a breach does not occur until after I issue a declaratory judgment on the parties' rights and obligations in this matter, CAMC may have at least alleged an anticipatory breach of contract.  ERC has obviously demonstrated an intention to refuse such performance (i.e., payment to CAMC) in the future.  *See Annon v. Lucas*, 185 S.E.2d 343, 353 (W. Va. 1971) (citing 17 Am. Jur. 2d Contracts § 448).

[37]   CAMC has also contributed some monies ($1,995,000) to the settlement which it may not have had to pay if the settlement was covered by ERI and/or the Hercules policy's Group II coverage.  The parties seem to assume that this amount is merely CAMC's self-insured retention

(continued...)

Moreover, the allegation of nominal damages is enough to avoid dismissal of a breach of contract claim. *See Harper*, 185 S.E. at 226. Because I have found that CAMC has alleged that ERC breached a contract, then I am permitted to infer that CAMC has suffered at least nominal damages sufficient to state a claim. *Id.* CAMC may still prove other damages at trial, but nominal damages arising from a breach ensures that CAMC can survive a motion to dismiss. I therefore **FIND** that CAMC has alleged sufficient facts to state a claim for breach of contract, and ERC's Motion to Dismiss is **DENIED** as to CAMC's breach of contract claim.

### C. CAMC has stated a claim for unfair trade settlement practices and common law bad faith

ERC also seeks to dismiss CAMC's statutory unfair trade settlement practices claim and its *Hayseeds* common law bad faith claim. I **FIND** that CAMC has stated a claim for both causes of action under Rule 12(b)(6).

First, because I have found that CAMC has pled sufficient facts from which an abrogated or modified contract between CAMC and ERC could exist, a contract exists for the purposes of this motion out of which a duty of good faith and fair dealing would arise. *See Elmore v. State Farm Mut. Auto. Ins. Co.,* 504 S.E.2d 893, 897 (W. Va. 1998). Under such a contract, to which CAMC would be a party or a third-party beneficiary, CAMC would be qualified to assert these kinds of claims because it is not a third-party claimant. *Cf. S. W. Va. Paving, Inc. v. Elmo Greer & Sons, LLC et al.*, __ F. Supp. 2d __, No. 2:09-cv-342 (S.D. W. Va. June 29, 2009) (Goodwin, J.).

### 1. CAMC has stated a claim under the WVUTPA

---

[37](...continued)
amount, but it may not qualify as such under the Hercules policy if the obligation is covered under Group II of that policy (which has no self-insured retention amount) and in the event that ERI is found to be not liable for less than it has paid or for any part of the settlement.

CAMC has alleged that ERC's acts and omissions and "its refusal to honor its obligations under the ERC Reinsurance agreement and the Hercules policy constitute violations of [the] West Virginia Unfair Trade Practices Act . . . ." (CAMC Cross-Claim ¶ 55.) CAMC alleges that "ERC is improperly, maliciously and in bad faith attempting to hide behind the formalities of Vandalia in order to deny coverage to CAMC" and that "ERC has unreasonably and erroneously denied coverage to CAMC." (*Id.* ¶¶ 60-61.)

ERC argues that CAMC has failed to assert sufficient factual allegations to support its statutory bad faith claim because CAMC has not alleged that ERC engaged in a general business practice. CAMC responds that it can show such a general business practice with one claim and that "ERC's conduct in regard to this claim alone is sufficient." (CAMC's Resp. 19.) In its reply, ERC retorts, without explanation, that "ERC's purported conduct in regard to this claim is not sufficient."

At the outset, I can infer from the facts alleged by CAMC that it is asserting a violation of West Virginia Code § 33-11-4(9)( f), which is "Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." To assert such a claim under the West Virginia Unfair Trade Practices Act ("WVUTPA"), CAMC must demonstrate that ERC has engaged in a general business practice, and that there is more than a single violation. *Elmore*, 504 S.E.2d at 902 (citing W. Va. Code § 33-11-4(9)). A claimant may, however, produce evidence of a general business practice in a single claim. *Id.* (quoting Syl. pt. 4, *Dodrill v. Nationwide Mut. Ins. Co.*, 491 S.E.2d 1 (W. Va. 1996)).

> To maintain a private action based upon alleged violations of W.Va. code § 33-11-4(9) in the settlement of a single insurance claim, the evidence should establish that the conduct in question constitutes more than a single violation of W.Va. code § 33-11-4(9), that the violations arise from separate, discrete acts or omissions in the claim settlement, and that they arise from a habit, custom, usage, or business policy of the insurer, so that, viewing the conduct as a whole, the

> finder of fact is able to conclude that the practice or practices are sufficiently pervasive or sufficiently sanctioned by the insurance company that the conduct can be considered a "general business practice" and can be distinguished by fair minds from an isolated event.

Syl. pt. 4, *Dodrill*, 491 S.E.2d 1.

Because CAMC may allege a violation of the WVUTPA based on a single insurance claim, I **FIND** that CAMC has pled sufficient facts to demonstrate that ERC may have had a business policy that it would not pay any large claims or a business policy that it would now reject all claims by CAMC under the Reinsurance Certificate and the Hercules policy despite having paid such claims before.[38] Therefore, ERC's Motion to Dismiss is **DENIED** with respect to CAMC's statutory bad faith claim.

### 2. CAMC has stated a common law bad faith claim

In support of its bad faith *Hayseeds* claim, CAMC has alleged that ERC has improperly denied coverage in this matter after paying previous claims and has engaged in "a pattern and practice of malice and bad faith in its attempt to deny coverage to CAMC." (CAMC Cross-Claim ¶ 76-77.) ERC asserts that this claim should be dismissed pursuant to Rule 12(b)(6) because CAMC has not pled facts to support the existence of a contract or breach. ERC also argues that the common law of good faith and fair dealing runs only between insurers and insureds on the basis of a contractual relationship, which is absent in this case.

Under *Hayseeds, Inc. v. State Farm Fire & Cas.*, 352 S.E.2d 73 (W. Va. 1986), whenever a policyholder substantially prevails against an insurer on an underlying contract action, the insurer

---

[38]  As I have noted, ERC previously paid to CAMC claims in the amount of $500,000 and $1,900,000. (CAMC Cross-Claim ¶ 70.) CAMC has also alleged that over the course of twenty-five years, CAMC and ERC dealt directly with each other, CAMC paid premiums to ERC rather than to Vandalia, and ERC has never before tried to enforce any of the formalities of Vandalia and the Reinsurance Certificate in handling claims.  (*Id.* ¶¶ 22, 27-28, 40-44.)

is liable for reasonable attorney's fees, net economic loss caused by the delay in settlement, and damages for aggravation and inconvenience.  Syl. pt. 1, *id.*  An insurer may also be liable for punitive damages if a refusal to pay a claim is motivated by a malicious intent to injure or defraud. Syl. pt. 2, *id.*  A *Hayseeds* action is premised upon the existence of a contract between the parties because "when an insured purchases a contract of insurance, he buys insurance—not a lot of vexatious, time-consuming, expensive litigation with his insurer."  *Id.* at 79; *see also Elmore*, 504 S.E.2d at 896-97.  "In the absence of such a [contractual relationship between insurer and insureds] there is simply nothing to support a common law duty of good faith and fair dealing on the part of insurance carriers . . . ."  *Elmore*, 504 S.E.2d at 897.

As I have discussed, CAMC has pled sufficient facts to state a claim for breach of contract, the existence of a contract between CAMC and ERC and the breach of such a contract.  ERC therefore may have owed a duty of good faith and fair dealing to CAMC, and CAMC may validly state a *Hayseeds* claim against ERC.  Accordingly, ERC's Motion to Dismiss is **DENIED** as to CAMC's common law bad faith claim against it.

### D.  CAMC has stated an unjust enrichment claim against ERC

Finally, ERC is seeking to dismiss CAMC's unjust enrichment claim.  ERC argues that the doctrine of unjust enrichment cannot be used to alter the terms of a contract, and seems to believe that CAMC is asking the court to convert the contracts into the equivalent of certificates of deposit. Moreover, ERC argues that CAMC has not pled any facts supporting its claim that ERC has avoided its obligations under the contracts or that CAMC has made any payments in excess of its self-insured retention.  I **FIND** that CAMC has asserted sufficient factual allegations to state a claim for unjust enrichment to avoid dismissal under *Twombly*.

To prevail on an unjust enrichment claim, a party must show that it has paid money to another party because of a mistake of fact that a contract, or other obligation, required such payment. *See Prudential Ins. Co. of Am. v. Couch*, 376 S.E.2d 104, 108 (W. Va. 1988).  In such a case, the party making the payment is entitled to repayment because it would be unjust to allow the payee to retain the money on which it had no valid claim.  *Id.*  Equity and justice therefore require its return. *Id.*

CAMC has alleged that it paid premiums to ERC for twenty-five years in the amount of $2,568,646.51 annually because it believed that ERC was its direct insurer and that Vandalia was merely a straw man with whom CAMC was not intended to deal directly.  CAMC has alleged enough facts to demonstrate that it believed that such payment was required by the relationship between the parties.  CAMC has stated a valid claim for unjust enrichment to avoid dismissal under Rule 12(b)(6).[39]  In sum, ERC's Motion to Dismiss CAMC's Cross-Claim is **DENIED** in its entirety.

## V.  ERC's Motion to Dismiss Vandalia's Cross-Claim

In its cross-claim against ERC, Vandalia seems to be asserting the following claims: (1) a request for declaratory judgment, (2) a breach of contract claim, and (3) a claim for unjust enrichment.  Specifically, Vandalia is seeking a declaration from the court that ERC assumed all of Vandalia's duties and obligations to CAMC under the Hercules policy, and that to the extent that CAMC is entitled to coverage under that policy, ERC must provide coverage directly to CAMC.  In the alternative, Vandalia asserts that "regardless of whether ERC assumed all of Vandalia's

---

[39] ERC is incorrect: CAMC is not seeking to alter the specific language of a contract through unjust enrichment.  Instead, CAMC is asserting the equitable claim as an alternative to the court finding that ERC is directly liable to CAMC.  For if ERC is not directly liable to CAMC, and does not owe CAMC any insurance coverage, why has CAMC been making premium payments to ERC?  I also note that ERC does not dispute the assertion that CAMC has been paying premiums directly to ERC.  CAMC is entitled to pursue its claim of unjust enrichment against ERC.

obligations under the Hercules policy," ERC should provide coverage to Vandalia under the Reinsurance Certificate because "to the extent that CAMC is entitled to coverage under the Hercules policy, ERC is obligated to provide coverage to Vandalia under the ERC Reinsurance agreement." (Vandalia's Cross-Claim ¶¶ 51, 44.)   Vandalia has also alleged that ERC has breached its obligations to CAMC under the Hercules policy and its obligations to Vandalia under the Reinsurance Certificate. (*Id.* ¶¶ 50, 55.) Finally, Vandalia argues that if ERC is permitted to avoid its obligations under the relevant contracts, it will have been unjustly enriched because CAMC paid premiums directly to ERC and ERC made substantial profits from the CAMC–Vandalia–ERC relationship. (*Id.* ¶¶ 22, 28, 38.)

ERC asserts that Vandalia's cross-claim should be dismissed under Rule 12(b)(6).  ERC argues that, to the extent that Vandalia seeks a declaration that ERC owes coverage directly to CAMC, ERC has no duties or obligations toward CAMC under the Hercules policy or the Reinsurance Certificate and CAMC has no direct right of recovery against ERC.   Moreover, ERC maintains that, even if CAMC had such a direct right of recovery against ERC, Vandalia has not alleged any facts which would support a breach of contract claim.  ERC maintains that Vandalia has not alleged that it has made any specific payment requests under the Vandalia/Hercules Policy or identified *how* ERC breached the Reinsurance Agreement.  Moreover, ERC argues that Vandalia has not asserted that Vandalia has made any payments with respect to the Underlying Litigation that have not been reimbursed or that ERC has refused to reimburse such payments.

ERC further argues that Vandalia has not stated a claim for unjust enrichment against it because Vandalia is asking to convert the contracts into something they are not (the equivalent of

certificates of deposit) and because it has not pled any facts supporting its claim that ERC has avoided its obligations under the contracts.

### A.  Vandalia's declaratory judgment action should not be dismissed

As an initial matter, my reading of Vandalia's cross-claim reveals that Vandalia is asserting a declaratory judgment action.  Vandalia has requested that I declare that ERC assumed all of Vandalia's duties and obligations to CAMC under the Hercules policy, and that to the extent that CAMC is entitled to coverage under the Hercules policy, ERC must provide such coverage directly to CAMC.  (Vandalia's Cross-Claim 19.)  In the alternative, Vandalia asks that I declare that ERC is obligated to provide full coverage to Vandalia under the Reinsurance Certificate, and that to the extent that CAMC is entitled to coverage under the Hercules policy, ERC is obligated to provide coverage to Vandalia under the Reinsurance Certificate.  (*Id.*)  As with the other parties' declaratory judgment requests, I **FIND** that Vandalia has demonstrated that there is a substantial live controversy between the parties, who have adverse interests, and that this issue is of sufficient immediacy and reality to warrant the issuance of a declaration of rights or other legal relations.  *See* 28 U.S.C. § 2201(a); *Energy Corp. of Am.*, 543 F. Supp. 2d at 541); *Majeed,* 520 F. Supp. 2d at 724-25.[40]

### B.  Vandalia has stated a claim for breach of contract

Vandalia is not only asserting a request for declaratory judgment but is also asserting two breach of contract claims, however inartfully.  In this case Vandalia is not only seeking an Order

---

[40] ERC argues that Vandalia must be asserting a breach of contract claim instead of a request for a declaratory judgment because such a cross-claim would be repetitious and unnecessary in the context of this broader action to establish the parties' rights and obligations under the contracts. That may be true, but I do not see it as a reason to dismiss Vandalia's cross-claim under Rule 13. It is clear, from the relief sought by Vandalia, that it is asserting a declaratory judgment action in addition to a breach of contract claim, for which it seeks damages.

from this court declaring the rights and obligations of ERC to CAMC and/or Vandalia, but is also asking for damages, including punitive damages, against ERC. *See Douros v. State Farm Fire & Cas. Co.*, 508 F. Supp. 2d 479, (E.D. Va. 2007) (finding that because the plaintiffs desired monetary damages to compensate them for alleged breach of an insurance policy, they had stated a breach of contract claim rather than simply a claim for declaratory judgment). Accordingly, to state a claim for breach of contract under Rule 8, Vandalia must allege the following elements: the existence of a valid, enforceable contract, that the plaintiff has performed under the contract, that the defendant has breached or violated its duties or obligations under the contract, and that the plaintiff has been injured as a result. *See* 23 Williston on Contracts § 63:1 (Richard A. Lord, ed. 4th ed. West 2009); *Harper*, 185 S.E. at 225-26; *Charleston Nat'l Bank of Charleston*, 70 S.E.2d at 813; *White*, 3 S.E.2d at 16. ERC is challenging the existence of a contract, breach, and damages.

Vandalia appears to be asserting a breach of contract claim against ERC under two theories: (1) ERC has allegedly breached its direct coverage obligations to CAMC under the Hercules policy and Reinsurance Certificate, and (2) ERC has allegedly breached its obligations to Vandalia under the Reinsurance Agreement. ERC seeks to dismiss this claim under Rule 12(b)(6) because it argues that even if CAMC has a direct right of recovery against ERC under the contracts, Vandalia has not alleged any facts showing that ERC breached any duty or obligation to CAMC or Vandalia. I **FIND** that Vandalia has stated a claim for breach of contract.

### 1. Vandalia has alleged the existence of a valid contract

I **FIND** that a valid, enforceable contract exists under both of Vandalia's breach of contract theories. Like CAMC, Vandalia has alleged sufficient facts to support a claim that CAMC and ERC subsequently modified the Reinsurance Certificate by acting as a primary insurer and insured over

the course of twenty-five years.[41]  However, I question Vandalia's ability to bring any claim under

a new contract between CAMC and ERC because Vandalia likely would not be a party or third-party

beneficiary to such contract.  Regardless, Vandalia has also alleged sufficient facts to support its

alternative claim that ERC and Vandalia had a contractual relationship under the Reinsurance

Certificate if it has not been so modified.

### 2. Vandalia has alleged that ERC is in breach of contract

I **FIND** that, like CAMC, Vandalia has alleged sufficient facts to support its claim that ERC

has breached either the possible modified/abrogated Reinsurance Certificate or the Reinsurance

Certificate itself by denying coverage in this matter.  Vandalia has asserted that "some 25-years after

not observing any formalities with regard to Vandalia, a significant claim has arisen and ERC is

attempting to hide behind the arrangement that it helped create and substantially profited from in

order to deny coverage in this case." (Vandalia's Cross-Claim ¶ 46.)  Vandalia has also alleged that

"ERC has, to date, refused to honor its obligations under the ERC Reinsurance agreement.  ERC is

therefore in breach of the ERC Reinsurance agreement." (*Id.* ¶ 55.)  Because Vandalia alleges that

ERC has denied coverage to CAMC and Vandalia, I can infer that Vandalia has made some sort of

a claim or demand for coverage from ERC.[42]  Vandalia therefore has sufficiently alleged the element

of breach.

---

[41]   Vandalia has repeated ERI and CAMC's assertions about ERC and CAMC's direct relationship, namely, that: over twenty-five years of business dealings, ERC communicated directly with CAMC or through Myron Steves, Inc. to CAMC (Vandalia's Cross-Claim ¶ 27); CAMC paid premiums to ERC directly (*Id.* ¶ 22); CAMC either provided notice of claims to Myron Steves, Inc. or to ERC and claim notices never came from Vandalia (*Id.* ¶¶ 40-41); and that ERC conducted itself as if it was the primary insurer for CAMC.  (*Id.* ¶ 47.)

[42]   Like CAMC, Vandalia may have alleged an anticipatory breach of contract because ERC has obviously demonstrated an intention to refuse coverage in the future.  *See Annon*, 185 S.E.2d at 353.

### 3.   Vandalia has alleged that it was injured by ERC's breach

If ERC refuses to pay CAMC, Vandalia may be liable to CAMC under the Hercules policy. As I discussed above in my resolution of ERC's Motion to Dismiss CAMC's breach of contract claim, Vandalia's potential liability based on the outcome of this declaratory judgment action is too speculative to be recoverable damages for breach of contract.  *See Commonwealth Tire Co.*, 193 S.E.2d at 550.  However, because I have found that Vandalia has alleged a breach of a contractual duty by ERC, then I am permitted to infer that Vandalia has suffered at least nominal damages sufficient to state a claim for breach of contract and to survive a motion to dismiss.  *See Harper*, 185 S.E. at 226.  ERC's Motion to Dismiss Vandalia's Cross-Claim is **DENIED** as to Vandalia's breach of contract claim.

### C.   Vandalia has not stated a claim for unjust enrichment

ERC also argues that Vandalia has not stated a cross-claim for unjust enrichment against it because: (1) equity cannot be used to alter the terms of express contracts; (2) Vandalia is asking to convert the contracts into something they are not (the equivalent of certificates of deposit); and (3) Vandalia has not pled any facts supporting its claim that ERC has avoided its obligations under the contracts.  ERC maintains that CAMC has not alleged to have made any payments in excess of its self-insured retention amount and Vandalia has not pled any facts identifying a contractual obligation that ERC failed to perform.  I **FIND** that Vandalia has not stated a claim for unjust enrichment under Rule 8 because Vandalia has not paid any monies to ERC.

As I have stated, to prevail on an unjust enrichment claim, a party must show that it has paid money to another party because of a mistake of fact that a contract, or other obligation, required such payment.  *See Couch*, 376 S.E.2d at 108.  The party making the payment is entitled to repayment

because it would be unjust to allow the payee to retain the money on which it had no valid claim. *Id.* Equity and justice therefore require its return. *Id.*

My review of Vandalia's cross-claim reveals that Vandalia has made allegations regarding Vandalia's status as a straw man, CAMC's direct payment of premiums to ERC and ERC's profits as a result of its contractual relationships with CAMC and Vandalia. Vandalia contends that "ERC has profited in the estimated amount of $38,000,000.00 by virtue of the scheme that it orchestrated in setting up Vandalia and drafting and issuing the Hercules policy, and is unjustly enriched if permitted to reap the benefits and avoid its obligations." (Vandalia Cross-Claim ¶ 38.) Vandalia has not, however, alleged that *Vandalia* (rather than CAMC) has paid any money to ERC and that ERC has been unjustly enriched as a result. It therefore has not pled sufficient facts to support its unjust enrichment claim, and ERC's Motion to Dismiss that particular claim is **GRANTED**. In sum, ERC's Motion to Dismiss Vandalia's Cross-Claim is **DENIED** as to Vandalia's request for declaratory judgment and breach of contract claim, and **GRANTED** as to its claim against ERC for unjust enrichment.

## VI. Conclusion

For the reasons stated above, ERC's Motion to Dismiss the Second Amended Complaint [Docket 39] is **GRANTED in part** and **DENIED in part**. Accordingly, ERI's claim against ERC for equitable contribution contained in the Second Amended Complaint is hereby **DISMISSED**, while ERC's declaratory judgment action survives this Order.

ERC's Motion to Dismiss the Cross-Claim of Charleston Area Medical Center, Inc. [Docket 61] is **DENIED**.

ERC's Motion to Dismiss the Cross-Claim of Vandalia Insurance Company [Docket 59] is **GRANTED in part and DENIED in part**. It is **GRANTED** as to Vandalia's unjust enrichment claim against ERC. It is **DENIED** as to Vandalia's request for a declaration concerning ERC's obligations to CAMC and Vandalia's breach of contract claim against ERC.

Finally, the similar motions filed by ERC before the Second Amended Complaint, namely, its Motion to Dismiss First Amended Complaint [Docket 17], Motion to Dismiss the Cross-Claim of Charleston Area Medical Center, Inc. [Docket 25], and Motion to Dismiss the Cross-Claim of Vandalia Insurance Company [Docket 27], are hereby **DENIED as moot**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:          July 30, 2009

Joseph R. Goodwin, Chief Judge

-59-