**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

EXECUTIVE RISK INDEMNITY, INC.,

Plaintiff,

v.                                                    CIVIL ACTION NO.  2:08-cv-00810

CHARLESTON AREA MEDICAL CENTER, INC., et al.,

Defendants.

**MEMORANDUM OPINION AND ORDER**

This multi-party insurance coverage dispute involves who, if anyone, must provide coverage to Charleston Area Medical Center, Inc. ("CAMC") for a multi-million dollar verdict against CAMC and a resulting settlement.  Pending before the court are four summary judgment motions: (1) a Motion for Summary Judgment filed by Executive Risk Indemnity, Inc. ("Executive Risk") [Docket 213]; (2) CAMC's Motion for Summary Judgment against Executive Risk [Docket 216]; (3) CAMC's Motion for Summary Judgment against Employers Reinsurance Corporation ("ERC") [Docket 218]; and (4) ERC's Motion for Summary Judgment [Docket 220].  As explained below, Executive Risk's Motion for Summary Judgment is **DENIED** and CAMC's Motion for Summary Judgment against Executive Risk is **GRANTED**.  In addition, CAMC's Motion for Summary Judgment against ERC is **DENIED** and ERC's Motion for Summary Judgment is **GRANTED**.

**I.       Background**

A.     *The Underlying Litigation*

The underlying litigation giving rise to the present insurance coverage dispute arose from a lawsuit filed against CAMC by Dr. R.E. Hamrick, Jr. in 2004.   In September 2004, CAMC determined that Dr. Hamrick's proposed plan for self-funding his medical professional liability was inadequate and not actuarially sound.  Based on that determination, CAMC explained to Dr. Hamrick that his insurance coverage had lapsed and his clinical privileges were revoked as a result.  Dr. Hamrick's loss of privileges was short-lived.  On September 13, 2004, Dr. Hamrick filed his original complaint against CAMC in the Circuit Court of Kanawha County, seeking the injunctive relief of reinstatement of his clinical privileges in addition to punitive damages.  Although the Circuit Court denied Dr. Hamrick's request for injunctive relief, the Supreme Court of Appeals of West Virginia ordered three days later that Dr. Hamrick's clinical privileges be restored.  Dr. Hamrick's claim for damages then proceeded in the Circuit Court, and CAMC immediately notified Executive Risk of the claim and submitted it for coverage.

On November 16, 2007, Dr. Hamrick filed a motion for leave to file his Second Amended Complaint, which was granted by the Circuit Court in early 2008.  As relevant here, the Second Amended Complaint interposed two claims for the first time:  a claim for defamation (Count II) and a claim for invasion of privacy – false light (Count III).  With respect to both claims, Dr. Hamrick alleged that CAMC owed him a duty which it breached by communicating that he did not have adequate insurance, that he had not demonstrated the actuarial soundness of his self-insurance plan, and that he was not qualified for clinical privileges.  In addition, Dr. Hamrick sought punitive damages, asserting that "the acts and/or failures to act . . . as set forth in the foregoing constitute

malice, oppression, wanton, willful, or reckless conduct, or criminal indifference to civil obligations affecting the rights of others." (Second Amend. Compl. [Docket 216-11] ¶ 147.)

On February 7, 2008, the defamation and invasion privacy claims went to the jury.[1] On that same day, the jury returned a sizable verdict against CAMC. In Section 1 of the verdict form, entitled "Liability," the jury simply indicated that they found in favor of Dr. Hamrick. (Verdict Form [Docket 213-1] at 1.) In Section 2 of the Verdict Form, entitled "Damages," the jury awarded Dr. Hamrick $5,000,000 in compensatory damages. In Section 3, labeled "Punitive Damages," the jury found that CAMC had engaged in "fraudulent, malicious, oppressive, wanton, willful, or reckless conduct with respect to Dr. Hamrick," and awarded $20,000,000 in punitive damages. (*Id.* at 2.) Finally, in Section 4, entitled "Other," the jury found that CAMC had acted in "bad faith, vexatiously, wantonly, or for oppressive reasons with respect to Dr. Hamrick." (*Id.*)

Following the verdict, CAMC moved for a remittitur of damages. On July 9, 2008, the Circuit Court granted the motion and reduced the damages award to $2,000,000 in compensatory damages and $8,000,000 in punitive damages. Thereafter, the parties subsequently settled the underlying litigation for $11,500,000. The parties appear to agree that the settlement amount consists of the remittitur award of $10,000,000, post-judgment interest in the amount of $476,917, and attorneys' fees in the sum of $1,023,083. As part of the settlement, the parties agreed to reserve all rights pertaining to the respective insurance policies.

B.     *The Policies*

---

[1] The parties have acted as if the jury was only presented with the defamation and invasion of privacy claims. The trial judge's jury charge, however, reflects that the jury was also instructed on Dr. Hamrick's tortious interference with contract claim and the jury's verdict does not reflect whether it found for Dr. Hamrick as to that claim.

Subsequent to the settlement of the underlying litigation, this dispute arose over which of CAMC's insurers, if any, must provide coverage to CAMC for the amount paid in the settlement. I will now briefly describe the insurance policies at issue.

1.    Executive Risk

Executive Risk provided Directors, Officers and Trustees Liability Insurance to CAMC effective from May 1, 2004 to May 1, 2005.  Upon CAMC's exhaustion of a $200,000 claim retention (essentially a deductible), the Executive Risk policy provides coverage in the aggregate net limit of $10,000,000, with a punitive damages limit $5,000,000.  The Executive Risk policy covers "Loss" which is defined as "any amount, including Defense Expenses, in excess of the applicable retention and not exceeding the Limit of Liability which an Insured is obligated to pay as a result of a Claim."  (Executive Risk Policy [Docket 220-10] at 2.)   A "Claim," in turn, is defined as "(1) written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act; or (2) a legal, injunctive or administrative proceeding against an Insured Person solely by reason of his or her status as such." (*Id.* at 1.)  Finally, a "'Wrongful Act' means any actual or alleged error, omission, misstatement, misleading statement or breach of duty." (*Id.* at 2.)

The Executive Risk policy contains two additional provisions that are relevant to this case. First, it contains an exclusion (the "Dishonest/Fraudulent Acts Exclusion") providing that Executive Risk will "not pay Loss for Claims brought about or contributed to in fact (1) by any dishonest or fraudulent act or omission or any willful violation of any statute, rule or law by any Insured." (*Id.*

-4-

at 3.)[2]  Second, the policy contains an endorsement (the "Punitive Damages Endorsement") that explicitly adds punitive damages to the definition of "Loss," subject to the terms of the Punitive Damages Endorsement.  One condition of the Punitive Damages Endorsement is that the "maximum aggregate Limit of Liability for all Punitive Damages shall be $5,000,000, which amount shall be part of, and not in addition to, [Executive Risk's] maximum aggregate Limit of Liability for all Loss."  (Executive Risk Policy, Endorsement No. 21 [Docket 220-10].)

2.   ERC

The second part of this case concerns the coverage dispute under a reinsurance policy issued by ERC.  The relationship between CAMC and ERC is complicated, largely because it involves an additional insurance company, Vandalia Insurance Company ("Vandalia"), who, by virtue of an agreement between the parties, is no longer a party to this lawsuit.  Vandalia issued the "Hercules Policy" to CAMC which provided the following three "Groups" of coverage effective from May 1, 2004 to May 1, 2005:  Health Care Professional Liability under Group I; Directors and Officers Liability, Employment Practices Liability, and Fiduciary Liability under Group II; and General Liability under Group III.  These Groups, which are explained in more detail below, set out the terms of coverage for each category of loss.

Vandalia, in turn, purchased a "Facultative Reinsurance Certificate and Reinsurance Schedule" (the "Reinsurance Certificate"), from ERC which indemnified Vandalia for 100% of the policy limits of the Hercules Policy.  These two documents, the Hercules Policy and the Reinsurance Certificate, operate together to provide reinsurance to CAMC from ERC through Vandalia.

---

[2] Executive Risk no longer places any emphasis on the "willful violation of any statute, rule or law" portion of the policy exclusion.  Accordingly, the court refers to this exclusion as the Dishonest/Fraudulent Acts exclusion.

Fortunately, in an effort to simplify these convoluted relationships, the parties entered into an aptly-titled "Agreement to Simplify Proceedings" [Docket 126-1]. This agreement dismissed Vandalia from the litigation and effectively consolidated the "Vandalia/ERC Coverage Documents" into one contract. Because the Hercules Policy sets out the relevant definitions and terms of coverage under that contract, I need only discuss the Hercules Policy for purposes of my analysis today.

Of relevance to this case are Groups II and Groups III of the Hercules Policy. Group II provides Directors and Officers, Employment Practices Liability, and Fiduciary Liability coverage up to $25,000,000 per loss event and in the aggregate. With respect to Group II, ERC agrees to cover CAMC's "ULTIMATE NET LOSS in excess of the UNDERLYING LIMIT(S) OF LIABILITY set forth in the Schedule of UNDERLYING INSURANCE as set forth in Schedule A." (Hercules Policy [Docket 220-11] at 3.) The underlying insurance set forth in Schedule A consists of two policies held by CAMC: the Executive Risk policy and an insurance policy with National Union Fire Insurance Company of Pittsburgh ("National Union"). As explained on Schedule A, the National Union policy was in excess of the Executive Risk policy. Finally, Group III of the Hercules policy provides coverage for "[a]ll coverages provided under this policy which are not listed in Group I and Group II above." (Hercules Policy [Docket 220-11] at 2.)

C.    *The Declaratory Judgment Action*

Executive Risk filed the instant diversity action on June 4, 2008, naming CAMC and ERC as defendants.[3] CAMC then filed a Counterclaim against Executive Risk and a Cross-Claim against

---

[3] This case was at one point consolidated with another case involving the same parties and events, *Employers Reinsurance Corp. v. Charleston Area Medical Center*, 2:08-cv-303. On March 11, 2010, however, the parties voluntarily agreed to dismiss the other case. *See* Stipulation of Dismissal [Docket 142], 2:08-cv-303 (S.D. W. Va. Mar. 11, 2010).

ERC.  I ruled on the parties' Rule 12(b) motions on July 30, 2009.  *See Exec. Risk Indem., Inc. v. Charleston Area Med. Ctr., Inc.*, 681 F. Supp. 2d 694 (S.D. W. Va. 2009).  The parties have since completed discovery.  Presently pending before the court are cross-motions for summary judgment that have been fully briefed and are now ripe for review.[4]

## II.     Summary Judgment Standard

       To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

       Although the court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.  Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of

---

       [4] Also pending before the court is ERC's unopposed Motion for Judgment on the Pleadings as to Plaintiff's Declaratory Judgment Claim [Docket 222].  In short, ERC explains that there is no live controversy between Executive Risk and ERC that would permit entry of a declaratory judgment affecting their rights.  Accordingly, ERC's Motion for Judgment on the Pleadings is **GRANTED**.

his or her position.  *Anderson*, 477 U.S. at 252.  Likewise, conclusory allegations or unsupported

speculation, without more, are insufficient to preclude the granting of a summary judgment motion.

*See Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

**III.    Discussion**

      Before delving into the parties' arguments on the merits, it is necessary to set the general

framework for my analysis today.  The insurance policies implicated by this coverage dispute are

very complicated contracts involving several different parties, some of whom are parties to this

litigation and some of whom are not.  As a result of these complex relationships, there are a

multitude of claims, defenses, and causes of action that may be available to the parties before the

court and those who are strangers to this litigation.  In order to avoid opining on those matters that

are not directly before me, I have made a sincere effort to focus my analysis in this opinion solely

on the claims, defenses, and arguments raised in the parties' summary judgment papers and not on

my own assessment of the voluminous record.

      A.    *Executive Risk*

      CAMC contends that there is coverage for the *Hamrick* litigation settlement under the plain

and unambiguous terms of the Executive Risk policy.  Relying almost entirely on the jury verdict

form, Executive Risk argues at least some portion of the settlement falls under the

Dishonest/Fraudulent Acts Exclusion and is therefore not covered.  Executive Risk never directly

suggests that there is *no* coverage as a result of the jury's findings, but instead maintains that the

jury's findings necessitate an allocation between covered and non-covered conduct.  According to

Executive Risk, CAMC bears the burden of allocation and CAMC cannot meet that burden because

of the general nature of the jury verdict.  As explained below, I disagree with Executive Risk's argument for denying coverage.

The court begins its analysis of an insurance coverage dispute by giving the terms of the insurance policy their plain, ordinary meaning.  *See Mylan Labs. Inc. v. Am. Motorists Ins. Co.*, 700 S.E.2d 518, 524 (W. Va. 2010).[5]  When those terms are "clear and unambiguous, they are not subject to judicial construction or interpretation."  *Id.* (internal quotation marks omitted).  Where, however, the language of an insurance policy provision "is reasonably susceptible of two different meanings or is of such doubtful meaning that reasonable minds might be uncertain or disagree as its meaning, it is ambiguous."  *Id.* (internal quotation marks omitted).  Whether an insurance contract is ambiguous is a question of law for the court to decide.  *Id.*  Moreover, it is "well-settled law in West Virginia that ambiguous terms in insurance contracts are to be strictly construed against the insurance company and in favor of the insured."  *Id.* (internal quotation marks omitted).

In a declaratory judgment action concerning insurance coverage, such as this case, the insured party need only make out a prima facie case that the claim falls within the scope of the policy's coverage.  *See Camden-Clark Memorial Hosp. Ass'n v. St. Paul Fire & Marine Ins. Co.*, 682 S.E.2d 566, 574 (W. Va. 2009).   Once that showing is made, the burden shifts to the insurance company to prove the facts necessary to support an applicable exclusion to coverage.  *Id.*  Moreover, "[w]here the policy language involved is exclusionary, it will be strictly construed against the insurer in order that the purpose of providing indemnity not be defeated."  *Id.* (internal quotation marks omitted); *see also Payne v. Weston*, 466 S.E.2d 161, 166 (W. Va. 1995) (observing that construing ambiguities

---

[5] West Virginia's substantive law applies to this diversity action.  *See Castillo v. Emergency Med. Assocs., P.A.*, 372 F.3d 643, 646 (4th Cir. 2004) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 66 (1938)).

against the insurance company is particularly relevant when "dealing with exceptions and words of limitation").

In this case, CAMC has made a prima facie case of coverage under the terms of the Executive Risk policy.  In the underlying litigation, the jury found that CAMC breached its duty to Dr. Hamrick by communicating that he lacked adequate insurance, that he had not demonstrated the actuarial soundness of his self-insurance plan, and that he was not qualified for clinical privileges.  Thus, there can be no question that CAMC's "breach of duty" constituted a "wrongful act" covered by the policy.  Moreover, punitive damages are expressly encompassed within the definition of "Loss" by virtue of the Punitive Damages Endorsement.  Accordingly, CAMC has made out a prima facie case, which Executive Risk does not directly dispute, of coverage under the policy for all aspects of its claim.

The burden then shifts to Executive Risk to prove the facts necessary to support an applicable policy exclusion.  Executive Risk primarily argues that the jury's findings in Section 3 and Section 4 of the verdict from trigger the Dishonest/Fraudulent Acts Exclusion. The jury found in Section 3 that CAMC had engaged in "fraudulent, malicious, oppressive, wanton, willful, or reckless conduct with respect to Dr. Hamrick which warrants the imposition of punitive damages."  In Section 4, the jury found that CAMC had acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." These findings quite clearly related to damages and attorney's fees, as the jury assessed liability only in Section 1 of the jury form.  Executive Risk's argument that the jury's findings in Section 3 and Section 4 related to something *other* than damages and attorney's fees is somewhat hard to fathom. The standards set forth in those sections are not elements of any of the causes of action on which the jury's liability finding in Section 1 could have been predicated, nor are those standards relevant to

-10-

compensatory damages. As a result, the only possible reason for the jury to have made such findings would have been in relation to punitive damages and attorney's fees, and it is undisputed that no attorney's fees were awarded in the underlying litigation.

In addition, Executive Risk has lost sight of the simple fact that the claims presented to the Hamrick jury were for defamation and invasion of privacy, not fraud.[6] Because Dr. Hamrick never pressed a cause of action that was predicated on fraudulent or dishonest conduct, the jury could not possibly have found for him on such a claim. Moreover, Executive Risk cannot identify any particular dishonest or fraudulent act or omission on the part of CAMC.

Instead, Executive Risk's entire position boils down to the argument that the last two sections of the jury verdict form somehow transformed the claim into one involving dishonest or fraudulent conduct. It appears, for example, that had the case settled for an identical amount while the jury was still deliberating, then Executive Risk would have no grounds for denying coverage on the basis of the Dishonest/Fraudulent Acts Exclusion. In other words, Executive Risk argues that the two findings made by the jury tainted the entire "Loss." I do not agree with that position. The conduct that gave rise to the Claim — i.e., the "Wrongful Act(s)" on the part of CAMC — remained constant throughout the underlying proceedings. Namely, CAMC was alleged to have wronged Dr. Hamrick by communicating to others his lack of insurance coverage, the actuarial deficiencies of his self-insurance program, and his revoked clinical privileges. There is no fraudulent or dishonest conduct

---

[6] Despite being set forth as a separate count of Dr. Hamrick's Second Amended Complaint, punitive damages are not a stand-alone cause of action in West Virginia. *See Perrine v. E.I. du Pont de Nemours & Co.*, 694 S.E.2d 815, 900 (W. Va. 2010) ("[T]he right to recover punitive damages in any case is not the cause of action itself, but a mere incident thereto." (internal quotation marks omitted)).

to be found in those acts or omissions, however, and the mere fact that the jury made predicate findings with regard to punitive damages and attorney's fees does not alter the nature of the conduct giving rise to the claim.

Executive Risk's argument for denying coverage is founded almost entirely on my decision in *Camden-Clark Memorial Hospital v. St. Paul Fire & Marine Insurance Co.*, 717 F. Supp. 2d 529 (S.D. W. Va. 2010).  According to Executive Risk, *Camden-Clark* places the burden on CAMC to allocate between covered and non-covered conduct.  Because CAMC cannot shoulder that burden, Executive Risk argues, it is entitled to summary judgment.  The insurance policy at issue in *Camden-Clark* primarily covered "medical professional injury that results from health care professional services provided," and the policy contained an exclusion for "bodily injury or property damages that's expected or intended by the protected person."  *Id.* at 532.  In the underlying litigation, the jury found in favor of the plaintiff on claims of medical negligence, fraudulent concealment, and outrage and awarded a substantial sum in compensatory and punitive damages.  *Id.* at 531-32.

Throughout the underlying litigation in *Camden-Clark*, the insurance company maintained that the non-medical claims (namely, the fraudulent concealment and outrage claims) were not covered under the terms of the policy and the intentional acts exclusion.  *Id.* at 533.  Thus, it was apparent from the outset that the underlying litigation involved a discrete covered claim (for medical negligence) and separate non-covered claims.  Moreover, the jury verdict form in the underlying litigation did not indicate whether the punitive damages awarded flowed from the covered claim or one or both of the non-covered claims.  *See id.* at 538.  In response to these circumstances, I certified two questions to the Supreme Court of Appeals.  In answering the first question, the Supreme Court ruled that, "if a court determination regarding allocation of a jury verdict between the claims covered

-12-

by the policy and the claims not covered by the terms of the policy is sought, the insured has the burden of proof to establish proper allocation." *Id.* at 535.  Second, with regard to punitive damages, the Supreme Court explained that "an insured who has controlled the defense in a case resulting in a punitive damage award has the burden of proving that the claims on which the punitive damage award is based is covered by the terms of the policy." *Id.*  Applying the certified question answers to the facts in *Camden-Clark*, I ruled that the insured party could not show that the damages at issue could be allocated to the discrete claim that was covered under the policy. *Id.* at 538.

Executive Risk's reliance on *Camden-Clark* is premised on a fundamentally mistaken assumption:  that the verdict and settlement in the underlying *Hamrick* litigation includes discrete non-covered claims.  As explained above, the present dispute does not concern coverage for distinct and non-covered causes of action (such as for fraud).  Thus, my opinion in *Camden-Clark is* inapposite here.  Unlike in *Camden-Clark*, where the insurance company maintained from the outset that the fraudulent concealment and outrage claims were not covered, there were only two claims in this case — for defamation and invasion of privacy — and no colorable argument that the conduct giving rise to them fit within the Dishonest/Fraudulent Act Exclusion.  Accordingly, there was simply no need to allocate the jury's verdict between covered claims and non-covered claims.  Unlike the insurance company's position in *Camden-Clark*, Executive Risk's argument for denying coverage stems not from the nature or the claims or the conduct giving rise to them, but from specific findings made by the jury as part of the damages award.  As a result, I find *Camden-Clark*'s allocation rules inapplicable to the case at hand.

In sum, CAMC had made out a prima facie case of coverage for "Wrongful Acts" as defined in its policy with Executive Risk.  The burden then shifts to Executive Risk to prove an applicable

-13-

exclusion.  As explained above, Executive Risk has not proven, by pointing to the jury form, that the Dishonest/Fraudulent Act Exclusion applies here.  Therefore I **FIND** that there is coverage for the "Loss."  For that reason, Executive Risk's Motion for Summary Judgment is **DENIED** and CAMC's Motion for Summary Judgment  against Executive Risk is **GRANTED**.

  B. *ERC*

  CAMC asserts that it is entitled to "concurrent coverage" under both Group II and Group III of the Hercules Policy.  In response, ERC offers several reasons why CAMC has failed to make out a prima facie case for coverage under either Group II or Group III.  Specifically, ERC contends that CAMC is not entitled to Group II coverage because CAMC has failed to exhaust the limits of liability in the underlying insurance policies.  ERC further contends that CAMC's claims are not covered by Group III of the policy because they are the type of claims coverable under Group II.  As explained below, I **FIND** that CAMC has not established a prima facie case of coverage under Group II of the Hercules Policy.  I also **FIND** that CAMC has not made out a prima facie case of coverage under Group III.

  In determining whether CAMC has made a prima facie case of coverage from ERC, I begin with Group II of the Hercules Policy, which provides coverage for "Directors and Officers Liability, Employment Practices Liability and Fiduciary Liability," in excess of the underlying insurance policies which provide coverage for the same categories of losses.  As discussed above, the relevant underlying policies are those which CAMC had with Executive Risk and National Union.  From the outset of the underlying *Hamrick* litigation, CAMC sought coverage for this claim from Executive Risk.  As explained above, I have determined that the Executive Risk policy did in fact cover CAMC's claim.  *See supra* Part III.A.  In light of this ruling and the terms of the Hercules Policy,

I **FIND** that CAMC's losses fall under Group II of the Hercules Policy.  Thus, if CAMC has met all

of the requirements under Group II, it would be entitled to coverage from ERC for this claim.

The most important requirement under Group II is that ERC only agreed to cover

"ULTIMATE NET LOSS in excess of the UNDERLYING LIMIT(S) OF LIABILITY set forth in

the Schedule of UNDERLYING INSURANCE as set forth in Schedule A."  (Hercules Policy

[Docket 220-11] at 3.)[7]  Schedule A provides as follows:

**SCHEDULE A**

SCHEDULE OF UNDERLYING INSURANCE

I.      Group II

A.  Directors and Officers Liability and          $10,000,000.   each **LOSS EVENT**
    Employment Practices Liability               $10,000,000   aggregate
    National Union Fire Ins. Co. of Pittsburgh
    Policy No. 4076366
    Policy Period: 05/01/04 to 05/01/05

*which is excess of:*

B.  Executive Risk Indemnity                      $10,000,000.   each **LOSS EVENT**
    Policy No. 8142-0835                          $10,000,000   aggregate
    Policy Period: 05/01/04 to 05/01/05

(Hercules Policy [Docket 220-11] at 22 (emphasis added).)

ERC argues that under Group II it only agreed to cover loss in excess of the aggregate policy

limits set forth in the underlying Executive Risk and National Union policies.  According to ERC,

the policy provides that the relevant limits are set forth in Schedule A, which states a $10,000,000

---

[7] The Hercules Policy defines "Ultimate Net Loss" as "the amounts paid by the INSURED as DAMAGES in settlement of claims or in satisfaction of awards or judgments, including prejudgment interest thereon, as a result of a LOSS EVENT."  (Hercules Policy [Docket 220-11] at 10.)   I will assume for the purpose of argument that CAMC's claim concerns "Ultimate Net Loss" that stems from a "Loss Event."

limit for the Executive Risk policy and a $10,000,000 limit for the National Union policy.  Thus, ERC maintains that it is only obligated to provide Group II coverage if the limits of *both* underlying policies, in the combined amount of $20,000,000, are met.  Because the underlying claim here only totaled $11,500,000, ERC contends that CAMC has not shown that it is entitled to Group II coverage.

CAMC does not dispute ERC's construction of the Hercules Policy head-on.  Rather, it offers a convoluted alternative interpretation of Group II's exhaustion requirements in attempting to explain why the $20,000,000 figure is incorrect.  According to CAMC, the Executive Risk policy's Punitive Damages Endorsement provides for a "maximum aggregate Limit of Liability for all Punitive Damages" in the amount of $5,000,000.  The *Hamrick* settlement amount included $8,000,000 in punitive damages.  By CAMC's reasoning, although the total aggregate limit of $10,000,000 in the Executive Risk policy was not met, the policy's punitive damages limit was exhausted, leaving $3,000,000 in punitive damages uncovered.  Instead of seeking coverage from the excess carrier, National Union, for the remaining $3,000,000, CAMC sought coverage under Group II of the Hercules Policy.

In explaining why it pursued coverage under Group II rather than from National Union, CAMC relies on its interpretation of the Nation Union policy.  I note that National Union is not a party to this litigation and thus has not had an opportunity to represent its rights and interests in this matter.  My ruling here today neither interprets the National Union Policy nor in any way alters or affects the rights of parties not before this court.  As I understand it, however, I am not being asked to rule on the actual rights and liabilities of CAMC vis-a-vis National Union.  Rather, CAMC is simply offering its interpretation of the National Union policy so that I may assess CAMC's

-16-

eligibility for coverage under Group II of the Hercules Policy.  The problem, however, is that, even under CAMC's reading of the National Union policy, it has not made out a case for prima facie coverage under Group II.

CAMC asserts that the National Union policy is a pure "follow form" excess insurance policy,[8] meaning that it adopts all of the terms, conditions, exclusions, and limitations of the Executive Risk policy.  In insurance parlance, the National Union policy identifies the Executive Risk as the "Followed Policy."  Because the National Union policy is a pure follow form policy, CAMC says that it adopts all of the terms and conditions of the Executive Risk policy, including "the same $5,000,000 cap for punitive damages."  (CAMC's Resp. to ERC's Mot. for Summary Judgment [Docket 227] at 13.)  Up to this point, CAMC is on solid ground.  Put simply, a follow form policy provides additional coverage in excess of the followed policy and subject to the followed policy's terms.  *See Hartford Acc. & Indem. Co. v. Chi. Housing Auth.*, 12 F.3d 92, 95 (7th Cir. 1993).  To put it another way, a follow form clause "makes an excess policy a carbon copy of the primary policy."  *Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's, London*, 871 N.E.2d 418, 426 (Mass. 2007).

Under CAMC's reading of the National Union policy as a pure follow form policy, the terms and conditions of the National Union Policy are a carbon copy of those in the Executive Risk policy,

---

[8] "A true excess policy does not broaden the underlying coverage.  While an excess policy increases the *amount* of coverage available to compensate for a loss, it does not increase the *scope* of coverage.  An excess policy may be written on a 'stand alone' basis or as a policy that 'follows form.'  A stand-alone excess policy relies exclusively on its own insuring agreement, conditions, definitions, and exclusions to grant and limit coverage.  A following form excess policy incorporates by reference the terms, conditions, and exclusions of the underlying policy.  An excess policy that follows form is designed to match the coverage provided by the underlying policy . . . ."  Douglas R. Richmond, "Rights and Responsibilities of Excess Insurers," 78 Denv. L. Rev. 29, 30 (2000).

duplicating an aggregate policy limit of $10,000,000 and a punitive damages limit of $5,000,000.

CAMC deviates from its own characterization of the National Union policy, however, in arguing that "each policy provides $10,000,000 in coverage for a total of $20,000,000, but the total cumulative amount that can be paid for punitive damages under *both* policies is $5,000,000." (CAMC's Resp. To ERC's Mot. For Summ. J. [Docket 227] at 14.)  CAMC asserts that it is "standard industry practice" for the punitive damages limit in these circumstances to be "exhausted simultaneously," meaning that "once the $5,000,000 limit is met under the [Executive Risk] policy, coverage is exhausted under both [Executive Risk] *and* under the [National Union] policy." (*Id.*)  In CAMC's view, while the $10,000,000 aggregate policy limits operate one way (sequentially) to provide up to $20,000,000 in coverage, the $5,000,000 punitive damages caps operate a different way (simultaneously) and offer only $5,000,000 in total coverage. In attempting to explain its strained and internally inconsistent construction, CAMC simply claims that its understanding is "standard industry practice."  CAMC, however, fails to cite to any part of the record of any judicial opinion recognizing that practice or otherwise supporting its construction of the interplay between the Executive Risk and National Union policies.

Once again, CAMC is only entitled to coverage under Group II if the settlement in the underlying *Hamrick* litigation was in excess of the underlying limits of liability in *both* the Executive Risk *and* the National Union policies.  Under CAMC's interpretation, the National Union policy contains a carbon copy of the terms and conditions of those in the Executive Risk policy, including punitive damages coverage up to $5,000,000.  Accordingly, CAMC has not offered any argument, law, or logic to establish that the remaining $3,000,000 in uncovered punitive damages was in excess of the limits in the National Union policy.  Because CAMC has not demonstrated that the National

-18-

Union policy limits were exhausted, it has not made out a prima facie case of coverage under Group II of the Hercules policy.

The only issue remaining is CAMC's contention with respect to Group III of the Hercules Policy. Group III covered "[a]ll coverages provided under this policy *which are not listed in Group I and Group II above*." (Hercules Policy [Docket 220-11] at 2 (emphasis added).) Moreover, the Exclusions section of the Hercules Policy states that Group III does not apply "to any liability for which coverage is provided, or would be provided except for limits thereof or exclusions therein, by coverages designated in Item 5. of the Declarations as Group II." (*Id.* at 12.) Despite these provisions, CAMC argues that it is entitled to "concurrent coverage" under Groups II and III because "[d]epending on how one views the defamation and invasion of privacy claims, these claims could clearly invoke Group II or Group II of the Hercules Policy, or both." (CAMC's Resp. to ERC's Mot. for Summary Judgment [Docket 227] at 19.) ERC counters that CAMC's losses are explicitly covered under Group II and, therefore, not covered under Group III.

CAMC is correct in theory that a loss event, particularly one consisting of a settlement or verdict on multiple counts of an underlying lawsuit against the insured, could implicate some claims under one Group and other claims under another Group. In this case, however, all of CAMC's claims are explicitly covered under Group II. CAMC is essentially asserting that when coverage is not available under the other Groups, due to the failure to exhaust the underlying insurance limits, then Group III provides fallback coverage, regardless of whether the *type* of claim is covered under Groups I and II.

As I discussed in my prior Motion to Dismiss Opinion, the "Hercules Policy clearly provides insurance coverage for three different and distinct *risks*." *Exec. Risk*, 681 F. Supp. 2d at 713

(emphasis added). "The Hercules Policy provides that if coverage exists under Directors and Officers Liability Coverage [Group II], then coverage is excluded under the Health Care/Professional Liability [Group I] and General Liability [Group III] coverages, and vice versa." *Id.* The proper inquiry is thus focused on the *risk* at issue, which, in this case, falls under the Directors and Officers Liability coverage in Group II. Group III does not provide coverage simply because CAMC has failed to exhaust the limits of the underlying insurance policies. If that were the case, then CAMC could claim coverage under Group III for *any* loss exceeding its self-insured retention amount. Such an outcome would completely obliterate the function of the two underlying insurance policies listed in Group II and completely ignores the policy language.

In sum, CAMC has failed to make out a prima facie case of coverage under either Group II or Group III of the Hercules Policy for the verdict and settlement in the underlying *Hamrick* litigation. Consequently, ERC's Motion for Summary Judgment is **GRANTED** and CAMC's Motion for Summary Judgment against ERC is **DENIED**.

## IV.    Conclusion

Pursuant to the foregoing, Executive Risk's Motion for Summary Judgment [Docket 213] is **DENIED** and CAMC's Motion for Summary Judgment against Executive Risk [Docket 216] is **GRANTED**. In addition, CAMC's Motion for Summary Judgment against ERC [Docket 218] is **DENIED** and ERC's Motion for Summary Judgment [Docket 220] is **GRANTED.** Finally, ERC's Motion for Judgment on the Pleadings as to Plaintiff's Declaratory Judgment Claim [Docket 222] is **GRANTED**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

-20-

ENTER:        May 12, 2011

Joseph R. Goodwin, Chief Judge